[No. S037625. June 19, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
LANELL CRAIG HARRIS, Defendant and Appellant.

1270

1274

## COUNSEL

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Joel Kirshenbaum, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Susan D. Martynec, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CORRIGAN, J.**—A jury sentenced defendant Lanell Craig Harris to death after finding him guilty of first degree murder during the commission of a robbery, attempted murder, and three counts of robbery, all with personal use of a firearm.[1] The jury hung on another murder charge, and on whether the attempted murder was premeditated. This appeal is automatic. We affirm the judgment.

## I. FACTS

The facts may be briefly stated for background purposes; further details and procedural matters will be discussed in connection with defendant's contentions.

### A. Guilt Phase

#### 1. Prosecution

##### a. The Contreras Murder

On the evening of August 7, 1991, defendant approached a group of men gathered in a grassy area of the Van Nuys Recreation Center. Defendant asked if they had drugs to sell; when they said no, he offered to sell them a camera. No one wanted the camera. When one of the men offered defendant a cup of soup, he became angry and knocked the cup to the ground. Another man, Alfredo Calleros, saw defendant try to pull up a large pipe that was

---

[1] Penal Code sections 187, subdivision (a), 190.2, subdivision (a)(17), 664, 211, 1203.06, subdivision (a)(1), and 12022.5, subdivision (a). Further statutory references are to the Penal Code, unless otherwise specified.

partially buried in the ground. Calleros picked up a milk crate and prepared to throw it at defendant. Defendant left, saying he would be back.

Defendant returned with another man about 15 minutes later. He approached Calleros and tried to shoot him, but the handgun misfired. As Calleros ran, defendant pointed the gun skyward and pulled the trigger. This time it fired. Most of the men in the area fled, but a group playing cards remained. Defendant and his companion approached them. Defendant aimed the gun at Efren Reyes's head and took money from his pocket. Defendant's companion took money from Reynaldo Villatoro.

Defendant approached Julian Contreras and reached for his wallet. When Contreras resisted, defendant shot him in the thigh. Contreras fell and defendant shot him twice more in the back. Defendant took Contreras's wallet and left with his companion. Contreras died at the hospital.

### b. *The Rodriguez Murder*

The murder charge on which the jury was unable to reach a verdict arose from events in January 1991 in Los Angeles. On the night of January 2, Alba Rodriguez went with her mother Marta to a Winchell's donut shop where Marta worked. Around midnight, Marta left to get supplies from another store. She returned and tapped on the door, signaling Alba to open it. As Alba approached the door, she saw defendant standing at the service window. The door was stuck closed; Marta told Alba to wait on the customer. Alba noticed that defendant had trouble speaking when he gave his order. While Alba was preparing the order, she heard her mother scream. Alba ran to the door and saw Marta struggling with defendant, who had a butcher knife. There was blood on Marta's chest. Alba unsuccessfully tried to open the door. Marta twice told her to call the police. As she went to the telephone, Alba saw defendant leaving. While she was making the phone call, Marta came through the door, collapsed, and died.

Marta had a stab wound on the left side of her chest, four inches deep, which cut through a piece of one rib and completely through her heart. She also had a wound on her left forearm, which the medical examiner characterized as a typical defensive wound.

### 2. *Defense*

Defendant presented an alibi defense to the Contreras murder. His wife, Lucinda Harris, testified that she and defendant spent the entire afternoon and evening together. They visited Lucinda's parents, went to a pool hall for about an hour, and then to Lucinda's apartment, arriving around 8:30 or 9:00

p.m. They drank some beer, and Lucinda took a bath. She could hear defendant talking on the telephone as she bathed. He did not leave her apartment that night.

The defense called no witnesses regarding the Rodriguez murder.

B. *Penalty Phase*

1. *Prosecution*

Contreras's son and daughter testified about the impact his killing had on them and their family.

The court took judicial notice of defendant's six prior convictions, all resulting from pleas of guilty or no contest: (1) a residential burglary on November 21, 1984; (2) an assault with a deadly weapon or force likely to produce great bodily injury on December 16, 1984; (3) a first degree robbery on December 16, 1984; (4) an assault with a deadly weapon that resulted in the intentional infliction of great bodily injury on December 17, 1984; (5) a second degree robbery on December 17, 1984; and (6) an escape from police officers on December 18, 1984.

The prosecution presented witnesses to three incidents of defendant's uncharged criminal activity. William Scott testified that on August 21, 1979, when he was in high school, he was approached by three young men as he was leaving a store. One of them was defendant, who appeared to be about 16 years old. They commented on Scott's bicycle, an expensive racing model, and defendant asked if he wanted to trade it for an inferior bicycle. When Scott refused, defendant hit him in the windpipe without warning and left with Scott's bicycle. On the morning of his testimony, Scott was unable to identify defendant from a group of six photos, but when shown a single larger picture he recognized defendant as the person who had hit him.

In 1982, Christopher Stokes and Louie Magdaleno were employed as police officers for the Los Angeles Unified School District. On December 7 of that year, Stokes detained defendant, then a student, near the auditorium at San Fernando High School. He brought defendant in handcuffs to the security office and sat him in a room with Magdaleno. Defendant appeared to be under the influence of drugs. Stokes went to an adjacent office, where he heard defendant yelling threats at Magdaleno. Defendant demanded to know why he was there, and threatened to kill Magdaleno. Stokes reentered the room, and defendant threatened to kill him and his wife, saying he knew where they lived, or could find out. He was "screaming and yelling," and "had spit coming out of his mouth, a lot of foam and mucous from his nose."

Defendant began to walk toward Magdaleno, who subdued him with the assistance of two Los Angeles police officers. Shortly thereafter, defendant tried to walk out the door, and a scuffle ensued. Defendant was sprayed with Mace but continued struggling for five or 10 minutes. Both officers took defendant's threats seriously. Stokes had 24-hour police protection at his house, and Magdaleno stayed away from his home for the rest of the week.

Jerome Van Tress testified that he was a Frito-Lay salesman in 1984. Early on the morning of December 17, he drove to a 7-Eleven store in Pacoima. Looking inside, he saw someone throwing the clerk, who was a small man, from one end of the counter to the other. Van Tress drove to a police station and reported the attack. Returning to the 7-Eleven, he saw several police cars. The clerk was being taken to an ambulance; there was blood on the floor of the store and on the sidewalk outside. Van Tress identified defendant as the assailant. Detective Richard Knapp of the Los Angeles Police Department testified that he investigated the 7-Eleven robbery. Following a lead, he and a detective went to an apartment across the street, where a woman answered the door. Knapp saw defendant lying on the floor inside, with a bloody folding knife on a table next to him. The jury was told that this incident led to defendant's conviction for robbery and assault with a deadly weapon, and that he admitted intentionally inflicting great bodily injury on the 7-Eleven clerk.

2. *Defense*

At the penalty phase, defendant's stepmother Doris Harris testified about his experiences growing up, particularly his troubled relationship with his father. Dr. Robert White, a psychologist hired by the defense, interviewed defendant seven or eight times, and concluded that defendant suffered from chronic severe depression. Dr. White related traumatic events in defendant's life as well as his positive behavior in structured settings, like prison. Sonja Fox, a chaplain at a probation camp for juveniles, testified about her favorable impression of defendant's conduct during his six-month stay at the camp. Defendant's football coach in junior college, Charles Ferrero, testified that he was a positive influence on the team. Christine Branich, a correctional officer from Folsom, testified that defendant was a good worker and a good influence on other inmates while serving a prison term beginning in 1987. A deputy sheriff at the Los Angeles Central Jail, Jeffrey Creager, testified that while defendant was in custody in 1993, the year of the trial in this case, he was chosen as a trusty inmate worker, and had helped rescue another inmate who attempted suicide.

## II. DISCUSSION

### A. *The Adequacy of the Record*

Defendant challenges the adequacy of the appellate record in a number of respects. He initiated lengthy proceedings below to correct and augment the record, which resulted in three settled statements designating omissions that could not be rectified.

■ "[S]tate law entitles a defendant only to an appellate record 'adequate to permit [him or her] to argue' the points raised in the appeal. [Citation.] Federal constitutional requirements are similar. The due process and equal protection clauses of the Fourteenth Amendment require the state to furnish an indigent defendant with a record sufficient to permit adequate and effective appellate review. [Citations.] Similarly, the Eighth Amendment requires reversal only where the record is so deficient as to create a substantial risk the death penalty is being imposed in an arbitrary and capricious manner. [Citation.] The defendant has the burden of showing the record is inadequate to permit meaningful appellate review. [Citation.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 857–858 [48 Cal.Rptr.3d 1, 141 P.3d 135]; see also *People v. Rundle* (2008) 43 Cal.4th 76, 110–111 [74 Cal.Rptr.3d 454, 180 P.3d 224].)

Defendant urges us to reconsider our rule placing on the appellant the burden of demonstrating that the record is so inadequate as to frustrate meaningful review. He argues that he should not be required to speculate about issues that might have arisen from missing parts of the record, and that an incomplete record amounts to a structural defect requiring reversal without a specific showing of prejudice. Certainly a substantially defective record could amount to such a structural defect, but it remains the appellant's burden to make that showing. Defendant fails to do so here.

Defendant complains about the absence of a number of items in the first settled statement that are not typically reflected in an appellate record, so that their omission cannot be said to be an obstacle to review absent some special circumstance. These include physical gestures by witnesses during testimony and by the prosecutor during argument; charts referred to by counsel during the course of argument but not entered into the record as exhibits; the identities of jurors whose comments or questions were recorded by the reporter or whose actions were otherwise described in the transcript; the specific portions of a witness's taped statement that were played for the jury during closing argument; and the circumstances surrounding notes sent by the jury during its deliberations (i.e., why only certain portions of a witness's testimony were read back to the jury, exactly when the court received a note, and when or how counsel agreed

to a response). A defendant must rely on counsel to make items like these a part of the record if they have some significance regarding a potential appellate issue.

Defendant also contends that various off-the-record discussions deprived him of his right to a complete record. Section 190.9 requires "all proceedings" during trial to be transcribed in a capital case. This requirement does not include "private conferences between defense counsel and defendant, or among counsel and cocounsel or their witnesses." (*People v. Samayoa* (1997) 15 Cal.4th 795, 820 [64 Cal.Rptr.2d 400, 938 P.2d 2].) Here, the record does not reflect the nature of the discussions in question. Although the failure to transcribe them may have been a violation of section 190.9, it gives rise to no presumption of prejudice. Defendant must demonstrate that the omissions deprive him of meaningful appellate review. (*People v. Hinton* (2006) 37 Cal.4th 839, 919 [38 Cal.Rptr.3d 149, 126 P.3d 981].) He makes no effort to do so, failing to analyze the context of the "off the record" references in the reporter's transcripts. In each instance counsel and the court were unable to recall the substance of the discussions. Thus, the likelihood is that they involved either private discussions, routine issues of scheduling and the like, or other matters that would not affect our review.[2]

The second settled statement concerned four pretrial hearings in municipal court that were not recorded. Neither the court nor counsel could recall these hearings, which should have been reported under section 190.9. (See *People v. Freeman* (1994) 8 Cal.4th 450, 509 [34 Cal.Rptr.2d 558, 882 P.2d 249].) Clerks' transcripts reflect the subject matter of each of these hearings, however. Defendant does not analyze these transcripts or make any effort to discuss how the absence of reporters' transcripts affects his right to meaningful review, other than to complain that he lacks the information they would have provided. He fails to show prejudice. (*People v. Hinton, supra,* 37 Cal.4th at p. 919.)

The third settled statement reveals that the prosecutor and defense counsel submitted lists of proposed jury instructions at both the guilt and penalty phases, neither of which could be located by the clerk's office for inclusion in the record. The attorneys could not find the originals or copies of these lists. Furthermore, the court was unable to ascertain if it had compiled a list of the instructions it rejected; if such a list existed, its contents could not be settled.

---

[2] Defendant notes that one unrecorded discussion involved a juror. Although the settled statement states that the court and counsel could not recall any prior discussion with the juror, the juror was questioned on the record about her off-the-record contact with the court. It is clear from the transcript that the contact was a phone call from the juror to report her personal experience with a location discussed in a witness's testimony. The matter was fully explored by the court and counsel on the record.

Defendant argues that without knowing which of his proposed instructions were refused by the court, his appellate counsel cannot provide him effective assistance and there can be no meaningful review of the guilt and special circumstance verdicts.

As to the guilt phase instructions, the record includes lengthy discussions between the court and counsel on substance and terms. Defendant makes no attempt to detail how these discussions are insufficient for our review. He merely asserts that in many instances, which he does not specify, it cannot be discerned which party requested the instruction being discussed, or what it was the trial court refused to adopt. This assertion is insufficient to establish an inadequate record. Defense counsel stated on the record that he had gone over all the modifications worked out by the court and counsel, and had no further changes or deletions to suggest. Counsel raised no omissions from the guilt phase instructions in his motion for a new trial. Appellate counsel has raised a number of guilt phase instructional issues, which are addressed below. The lack of a written list of proposed instructions, and of instructions refused, does not appear to have hindered this effort.

Regarding the penalty phase, defendant acknowledges that the court read into the record all but one of the six special instructions his counsel submitted. He contends the contents of the omitted instruction cannot be ascertained. However, the court and counsel discussed this instruction, which concerned mitigating factors, in sufficient detail that it is clear defendant was not entitled to have it read to the jury. The prosecutor objected to the instruction because it singled out particular incidents and identified them as mitigating factors, when they could also be viewed as aggravating. The court noted that the instruction tended to "pinpoint certain pieces of evidence and not pinpoint others." Defense counsel argued that the instruction properly allowed the jurors to consider the incidents in mitigation "if you find they so apply." The prosecutor responded that if the instruction were given, she would in turn be entitled to a pinpoint instruction on every aggravating factor shown by the penalty phase evidence. The court concluded that the substance of the instruction was appropriate for argument, but not for instruction.

We have frequently ruled that instructions providing a partial list of mitigating factors, with reference to particular items of evidence, are improper. (See, e.g., *People v. Cook* (2007) 40 Cal.4th 1334, 1364 [58 Cal.Rptr.3d 340, 157 P.3d 950], and cases therein cited.) Defendant establishes no likelihood that the absence of a written record of his proposed special instruction has prevented his counsel from effectively evaluating the denial of this instruction as a possibly meritorious claim on appeal.

The second item on the third settled statement is a proposed questionnaire given by the trial court to counsel before jury selection, with a request for their suggestions. The clerk was unable to locate this document. Defendant mentions this omission but makes no effort to demonstrate how it might affect his right to meaningful appellate review. The third settled statement also notes that defense counsel's proposed additional questions for the jury questionnaire could not be found by the clerk or by counsel. Defendant again fails to develop any argument as to how the lack of this document has hampered appellate review.

Next, the third settled statement states that during jury selection, the court provided written questions to a group of male jurors regarding a remark by one prospective juror to the effect that "we'll give him a fair trial and then we'll hang him." The comment was made to the court clerk, who was unable to identify the juror. The court and counsel devoted some time to investigating which prospective juror made the remark, and the man who was generally agreed to be the most likely suspect was eventually excused. Although the settled statement declares that the questions given to the jurors on this subject could not be found or reconstructed, the court in fact read the questions aloud to the group of jurors, and they were transcribed by the reporter. Thus, defendant has suffered no prejudice from the absence of the document itself.

Finally, the third settled statement states that neither the clerk nor counsel were able to locate copies of letters given by defense counsel to the clerk to be mailed to four jurors after trial, in connection with defendant's motion for a new trial. Defendant speculates that the content of these letters may have prevented him from establishing the basis for obtaining a new trial. Any such possibility appears remote indeed, and furnishes no ground for deeming the record inadequate.

We emphasize, once again, that trial courts should take care to avoid off-the-record discussions in capital cases, and to comply with section 190.9 in all respects. (*People v. Freeman, supra,* 8 Cal.4th at p. 511.) Maintaining the documentary record is equally important. (See § 190.7.) These measures not only assure an adequate appellate record, but also obviate the burden of settling the record. (*Freeman,* at p. 511.) Human affairs being what they are, however, perfect records are not always achieved. Appellants must do more than merely complain about omissions; they must demonstrate that the record is insufficient for meaningful appellate review. (*People v. Rogers, supra,* 39 Cal.4th at pp. 857–858.) The significance of missing items must be analyzed with reference to what is reflected by the record. Here, defendant fails to establish that the omissions he notes resulted in a record so deficient as to make the appellate process unreliable.

B. *The Questioning of Reyes*

Defendant contends the prosecutor improperly led her witness, Efren Reyes, into an in-court identification. Reyes testified with the assistance of an interpreter. Near the beginning of his testimony, the prosecutor established that Reyes had been one of the cardplayers at the scene of Contreras's murder, and that the assailant had been a Black male. The prosecutor then asked if Reyes saw that person in the courtroom. Reyes said "no." The following exchange ensued:

"Q. All right. You don't see the person present in court today? Did you look in this part of the courtroom here?

"A. No.

"Q. Not in the audience; did you look up here also? No. I mean up here in the front.

"A. Yes. At a court date that I came before, and I testified, and he was here.

"Q. All right. And the person that was there when you came to court the · first time, does he look anything like the gentleman that's sitting at this table second from the end?

"[Defense counsel]: Objection.

"THE COURT: Overruled.

"THE WITNESS: Oh, yes, yes. It's him; it's him."

The prosecutor elicited the following explanation from Reyes for his failure to see defendant at first:

"A. . . . . I was looking on this side. I didn't look on the other side.

"THE COURT: Pointing to the jury, for the record.

"Q. [By the prosecutor]: Is the computer on the judge's bench blocking your view of that end of the table?

"A. Yes. This is, right here. That's why I didn't see him.

"Q. Okay. Indicating for the record, he's pointing?

"THE COURT: The computer monitor on top of the bench."

█ Defendant claims the prosecutor's leading questions violated Evidence Code section 767, subdivision (a)(1), as well as various constitutional rights.[3] The Attorney General correctly responds that the questioning of Reyes was proper under the circumstances. "A 'leading question' is a question that suggests to the witness the answer that the examining party desires." (Evid. Code, § 764.) Questions calling for a "yes" or "no" answer are not leading unless they are unduly suggestive under the circumstances. (*People v. Williams* (1997) 16 Cal.4th 635, 672 [66 Cal.Rptr.2d 573, 941 P.2d 752]; 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 165, pp. 229–230.) Furthermore, leading questions are not always impermissible on direct examination. "Evidence Code section 767, subdivision (a)(1), provides that leading questions 'may not be asked of a witness on direct or redirect examination' except in 'special circumstances where the interests of justice otherwise require.' Trial courts have broad discretion to decide when such special circumstances are present. [Citations.]" (*Williams*, at p. 672.)

Here, the court did not abuse its discretion by permitting the prosecutor to direct Reyes's attention toward defendant's location in the courtroom, even if her questions were leading. Reyes was evidently unable to see defendant from the witness chair because a computer monitor was in his line of sight. He looked around those parts of the courtroom he could see, initially searching the audience and then the jury box. Moreover, the possibility of improper suggestion was remote. Reyes had already identified defendant at the preliminary hearing, and before that picked him out of a live lineup of six persons during the police investigation. Under these circumstances, defense counsel's objection was properly overruled.

---

[3] Here, as elsewhere, defendant asserts violation of his federal constitutional rights to due process under the Fourteenth Amendment, a fair trial by jury under the Sixth and Fourteenth Amendments, and a reliable determination of guilt in a capital case under the Eighth and Fourteenth Amendments. The Attorney General contends these claims are waived because defendant did not identify his constitutional objections below.

What we stated in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17 [42 Cal.Rptr.3d 677, 133 P.3d 581], applies here: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none."

### C. *The Denial of the Motion for Acquittal on the Rodriguez Murder*

After the prosecution rested, defense counsel moved for a judgment of acquittal as to the charge of first degree murder of Marta Rodriguez, contending there was no evidence of deliberation or premeditation. The prosecutor responded that during the time defendant waited to place his order with Alba Rodriguez at the Winchell's window, and after he placed the order, he had sufficient time to deliberate and choose to kill before confronting Marta at the door. The court denied the motion, finding "sufficient evidence to allow the jury to decide the issue." The jury divided 10 to two on this charge, failing to agree on the issue of guilt in the first instance, not on the degree of the crime.

Defendant argues that while the jury was unable to reach a verdict on the Rodriguez murder, the trial court's denial of his motion for acquittal leaves him open to retrial for first degree murder. This is so. (See *Smith v. Massachusetts* (2005) 543 U.S. 462, 466–467 [160 L.Ed.2d 914, 125 S.Ct. 1129]; *People v. Lagunas* (1994) 8 Cal.4th 1030, 1039, fn. 6 [36 Cal.Rptr.2d 67, 884 P.2d 1015]; 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, § 140, p. 488.) The Attorney General contends the trial court properly denied the motion for acquittal, noting the evidence that (1) defendant was armed with a butcher knife in the early morning hours, a time when few witnesses were likely to be present; (2) Marta was stabbed in the left side of her chest with enough force for the knife to completely penetrate her heart; and (3) there was more than enough time for defendant to premeditate a killing while he stood at the service window.

■ On a motion for judgment of acquittal under section 1118.1, the trial court applies the same standard as an appellate court reviewing the sufficiency of the evidence. The court must consider whether there is any substantial evidence of the existence of each element of the offense charged, sufficient for a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. (*People v. Cole* (2004) 33 Cal.4th 1158, 1212–1213 [17 Cal.Rptr.3d 532, 95 P.3d 811].) We independently review the trial court's ruling. (*Id.* at p. 1213.) Here, defendant challenges only the sufficiency of the evidence of deliberation and premeditation.

■ "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated

judgment may be arrived at quickly. . . ." [Citations.]' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 [119 Cal.Rptr.2d 859, 46 P.3d 335].)

Here, defendant was armed with a knife and stabbed Rodriguez without provocation directly in the heart with enough force to penetrate part of a rib and pierce entirely through the heart. In the time it took for Alba to go from the door to the service window, and to take and prepare defendant's order, there was ample time for him to deliberate and premeditate before attacking Marta. Under these circumstances, we cannot say the jury could not reasonably have found defendant guilty of first degree murder.

### D. The Evidence of Threats Against Robert James

#### 1. Background

Robert James was the grandson of Doris Harris, defendant's stepmother. On October 17, 1991, a week after defendant was arrested, James gave a taped interview to police detectives. He told them that on September 23, he had walked by the park in Van Nuys with defendant. James wanted to play basketball, but defendant saw some Mexicans in the area and said they had to leave, "[c]ause . . . I blasted this fool in the park, and there go some of his homeboys." James said defendant later explained that he had seen some Mexicans gambling, went home to get his gun, and returned to the park with another person. They confronted the Mexicans and asked for money, "then the sewer rat jumped up and I shot him." Defendant's term for Mexicans was "sewer rats."

At trial, although James went over his taped statement with the prosecutor in the morning on the day he testified, by the afternoon he could recall very little of what he had told the detectives. After his testimony, the prosecutor learned from a detective who drove James home that James had been threatened by defendant's sister during the lunch break. The prosecutor wanted the detective to testify, so that the jury could evaluate the discrepancy between James's statements in court and those on the tape, which would be played for the jury. Defense counsel objected, arguing that the evidence of the threat would be unduly prejudicial because the jury would likely draw the conclusion that defendant had something to do with it.

The court decided to permit the detective to testify about the incident, with a limiting instruction informing the jury that the threat came from a family member, not from defendant. Detective Paul Stewart told the jury that he had been present during the interview conducted before James testified. At that time, James had recalled most of his statements in the taped interview. However, Stewart was also present when James was on the witness stand, at

which time "many of the things that he remembered in the morning . . . he said he did not remember when he testified." Stewart testified that while he was taking James home later that day, James said "that he was in the cafeteria of this building when he was approached by a woman who made the statement to him [that] you and your mother could disappear." The woman was "a family member."

The court cautioned the jury that Stewart's testimony was admitted only "to show the state of mind [of] the witness when the witness testified," not "to prove the truth of the statement that was made." The jury was told that "you must not draw any inferences with respect to the defendant as to those statements," and specifically that "you may not infer that . . . this was made by the defendant or at the defendant's behest. It is only to indicate the state of mind of the witness at the time when [the witness] testified so that you may properly evaluate that witness's testimony and any inconsistencies that you find that there are."

Thereafter, the prosecutor recalled James to the stand. She questioned him about the incident in the cafeteria, asking "did someone from your family and the defendant's family approach you during the lunch hour?" James said a woman had approached him, and they were "bickering back and forth." With some prompting, he said the woman had told him that he "better not lie on her brother" and that he and his mother might "come up missing." On cross-examination, defense counsel asked James about the threat, confirming that it was defendant's sister who delivered it. James said the threat had upset him at first, but did not affect his testimony in any way.

### 2. The Admissibility of the Threat Evidence

■ Evidence that a witness is afraid to testify or fears retaliation is admissible because it bears on credibility. (*People v. Burgener* (2003) 29 Cal.4th 833, 869 [129 Cal.Rptr.2d 747, 62 P.3d 1]; accord, e.g., *People v. Gonzalez* (2006) 38 Cal.4th 932, 946 [44 Cal.Rptr.3d 237, 135 P.3d 649]; *People v. Guerra* (2006) 37 Cal.4th 1067, 1141 [40 Cal.Rptr.3d 118, 129 P.3d 321].) Defendant acknowledges this well-established rule, but raises a series of objections to its application in this case.[4]

First, he contends the prosecutor failed to lay an adequate foundation for the relevance and probative value of the threat evidence. Defendant asserts that the admission of this evidence was improperly premised on the assumption that James was telling the truth in his taped statement. This is not the

---

[4] Defendant asserts violations of his rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and under article I, sections 7, 15, 16, and 17 of the California Constitution.

case; James's state of mind when he testified after hearing the threat had no necessary connection with the veracity of his earlier statement. Next, defendant contends the *Burgener* rationale is limited to cases of discrepancy between prior *sworn* testimony and later statements in court. This claim is supported by neither the cases cited in *Burgener* (*People v. Warren* (1988) 45 Cal.3d 471, 481 [247 Cal.Rptr. 172, 754 P.2d 218]; *People v. Feagin* (1995) 34 Cal.App.4th 1427, 1433 [40 Cal.Rptr.2d 918]), nor those following it (e.g., *People v. Gonzalez, supra,* 38 Cal.4th at pp. 945–946; *People v. Guerra, supra,* 37 Cal.4th at pp. 1141–1142). Defendant also argues there was no showing that James was indeed afraid to testify. He points to James's later testimony that the threat did not affect him. The court, of course, had no way of anticipating this testimony when it made its ruling. The court was aware of the discrepancy between the statements on the tape, and James's testimony, and the relevance of the threat he received immediately before he took the stand was obvious.

Defendant claims that in any event, the probative value of the evidence was outweighed by the prejudicial impact on the jury of learning that his sister had threatened a key witness and the witness's mother during trial. That determination, however, was "well within the discretion of the trial court." (*People v. Burgener, supra,* 29 Cal.4th at p. 869.) The jury was cautioned not to attribute the threat to defendant. Defendant claims the admonition was defective because it followed Detective Stewart's testimony, and the court spoke in terms of "the evidence you have just heard" and "the state of mind of the witness when the witness testified." Defendant suggests the jury would have understood these references to apply to Stewart, and thus the inferences they might draw regarding the threat to James were unrestricted. The suggestion is completely meritless. The detective's state of mind was not at issue, and his testimony was focused on the impact of the threat against James.

Defendant also complains that the admonition was not repeated after James was recalled and questioned about the threat. However, the court's cautionary instruction the previous week was lengthy and detailed, and promptly followed Detective Stewart's testimony, which first informed the jury of the threat. The court was not required to repeat the admonition, and defense counsel made no such request.

### 3. *The Prosecutor's Reference to the Threat in Closing*

Regarding James's testimony, defense counsel argued as follows in his closing: "He was threatened to such an extent that the People want you to believe him, and that's why he changed his testimony. Doesn't it strike you as a little odd that he wouldn't say anything before the testimony or he wouldn't want these people out of the courtroom?"

In her rebuttal, the prosecutor responded that it was precisely because he was threatened that James had said nothing before he testified: "The exact thing about threats is they scare you. And you don't necessarily run and tell on the person who just threatened you because they threatened you. And you don't want to make them any madder. So instead you come in and try to appease them. You come in and say I don't remember. And I might have made that part up. As they are sitting here in the audience staring at him, he is back-pedaling big time. . . . But what we know is true is his prior statement, what he said to the police, what you hear on the tape when no one was glaring at him and no one had threatened him and the defendant wasn't sitting there looking at him." Defendant, while refraining from making a claim of prosecutorial misconduct, contends the prosecutor's reference to his presence and the threat against James in the same sentence undermined the court's limiting instruction, and exacerbated the prejudice created by the admission of the threat evidence.

■ Defense counsel made no objection or request for an admonition from the court, which could have reinforced the limiting instruction and mitigated any undue prejudice. His claim is thus barred on appeal. (*People v. Thornton* (2007) 41 Cal.4th 391, 454 [61 Cal.Rptr.3d 461, 161 P.3d 3].) Defendant responds to the Attorney General's waiver argument by suggesting for the first time in his reply brief that the failure to object amounted to ineffective assistance of counsel. The argument is as meritless as it is belated. "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502 [117 Cal.Rptr.2d 45, 40 P.3d 754].) Here, while requesting an admonition was one tactical option, counsel could also have decided that objecting would focus the jury's attention on the threat incident in ways that would not be helpful to the defense.

The prosecutor's comment echoed her opening argument, where she made no mention of the threat but argued that James's taped statement was credible because it was made when "the defendant wasn't in the room looking at him, other family members weren't in the audience looking at him." The jury would understand that, regardless of any threat, James would have been more willing to incriminate his relative in a private interview than in open court, in the presence of defendant and other family members. Any implication in her later comment that defendant may have been involved with the threat was remote enough that counsel could reasonably have opted to let it pass without objection.

### E. *The Exclusion of Evidence of James's Probation Performance*

Defense counsel sought to impeach Robert James with testimony from his probation officer to the effect that James was dishonest. The court held a hearing under Evidence Code section 402 to determine what the probation officer would say. The parties agreed that because James was a juvenile, the officer could not go into specific matters reflected on his record. Harry Ridley testified that he was James's probation officer and had been for nearly a year. He considered James irresponsible. James had been evasive, did not comply with the conditions of his probation, and failed to keep Ridley informed of his whereabouts. Ridley recalled one particular lie James told, which he did not specify, but generally he based his opinion on James's failure to follow instructions.

The court heard extended argument from counsel, during which the prosecutor stated that if Ridley's testimony were admitted, she would be entitled to rehabilitate James by examining the reasons for his behavior. Ultimately, the court concluded that while the evidence of James's performance on probation was relevant to show his lax character and general lack of credibility, its probative value was insufficient to outweigh the consumption of time it would take to explore the matter, including collateral issues pertaining to his failure to comply with probation conditions. Accordingly, the court excluded the evidence of his probation performance under Evidence Code section 352.

Regarding specific instances of untruthfulness, the prosecutor acknowledged that Ridley remembered one time when James had lied to him. However, the court agreed with her argument that James's failure to keep promises made to his probation officer did not amount to "lies." After conferring with Ridley, defense counsel told the court there were "no additional grounds to go into." Counsel had interpreted Ridley's account of James's failure to do what he said he would do as instances of lying. Ridley did not testify before the jury.

■ Defendant contends the court abused its discretion under Evidence Code section 352. We disagree. " '[T]he latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' [Citation.]" (*People v. Ayala* (2000) 23 Cal.4th 225, 301 [96 Cal.Rptr.2d 682, 1 P.3d 3]; accord, *People v. Lewis* (2001) 26 Cal.4th 334, 374–375 [110 Cal.Rptr.2d 272, 28 P.3d 34].) Here, James's failures on probation were evidently numerous, and the prospect of prolonged nitpicking was a real one. Defendant claims the court's ruling deprived him of his fundamental rights to confrontation and to present

a defense, under the Sixth and Fourteenth Amendments to the federal Constitution. However, "we have repeatedly held that 'not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance.' [Citation.]" (*Ayala*, at p. 301; see also *Lewis*, at p. 375.)

Defense counsel had ample opportunity to question James regarding the discrepancies between his taped statement and his trial testimony. James himself testified that he had not been completely truthful during the police interview, when he incriminated defendant. Moreover, after it was shown that he had been threatened in advance of his original trial testimony, James denied the threat had affected him, but also confirmed the accuracy of the taped statements that he could not remember in his original testimony. Thus, James's truthfulness was already seriously compromised. Evidence of his performance on probation would have introduced a variety of collateral credibility issues, and would not "have produced 'a significantly different impression of [the witness's] credibility.' " (*People v. Frye* (1998) 18 Cal.4th 894, 946 [77 Cal.Rptr.2d 25, 959 P.2d 183], quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 [89 L.Ed.2d 674, 106 S.Ct. 1431]; see also *People v. Smith* (2007) 40 Cal.4th 483, 513 [54 Cal.Rptr.3d 245, 150 P.3d 1224].)[5]

### F. *The Witness Credibility Instructions*

Defendant claims the court erred by giving two instructions on witness credibility, CALJIC Nos. 2.13 and 2.24. He contends the former of these instructions unfairly bolstered the testimony of prosecution witnesses Robert James and Mark King, and the latter improperly skewed the credibility determination as to prosecution witness Delsie Noble.[6]

James's testimony is described in part II.D.1., *ante*, at pages 1287–1288. King provided a taped interview to detectives in which he said, among other things, that defendant told King "I had to smoke one of those Mexicans" during a robbery. However, on the witness stand King refused to confirm nearly everything on the tape, which was played for the jury. Noble testified that defendant had told him about the killing the day after it happened.

---

[5] Defendant complains that the prejudice resulting from the exclusion of the probation performance evidence was compounded by the giving of CALJIC No. 2.24, which told the jury: "If the evidence establishes that a witness's character for honesty or truthfulness has not been discussed among those who know him or her, you may infer from the absence of such discussion that such character trait is good." However, the evidence did *not* establish the absence of such discussion, and the conflicts in James's own testimony made it unlikely that the jury would have drawn any inference of truthfulness as a character trait of his.

[6] Defendant claims violation of his rights to a fair jury trial and to due process under the Sixth and Fourteenth Amendments to the federal Constitution.

Respondent argues that defendant invited any error by requesting these instructions himself. Respondent is correct. " 'The doctrine of invited error bars a defendant from challenging an instruction given by the trial court when the defendant has made a "conscious and deliberate tactical choice" to "request" the instruction.' [Citation.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 970 [111 Cal.Rptr.2d 2, 29 P.3d 103]; accord, *People v. Thornton, supra,* 41 Cal.4th at p. 436.)

Defense counsel joined the prosecutor in requesting CALJIC No. 2.13, which stated:

"Evidence that on some former occasion, a witness made a statement or statements that were inconsistent or consistent with his or her testimony in this trial, may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on such former occasions.

"If you disbelieve a witness' testimony that he or she no longer remembers a certain event, such testimony is inconsistent with a prior statement or statements by him or her describing that event."

█ In his closing argument, counsel emphasized the conflicts between various witnesses' trial testimony and their prior inconsistent statements. He also specifically asked the jury to remember a taped statement by Mark King indicating that he expected a reward for incriminating defendant, which King denied at trial. Thus, counsel had a legitimate tactical purpose for requesting CALJIC No. 2.13, and the invited error rule applies. (*People v. Hardy* (1992) 2 Cal.4th 86, 152 [5 Cal.Rptr.2d 796, 825 P.2d 781]; see also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49 [17 Cal.Rptr.3d 710, 96 P.3d 30].) In any event, defendant's argument is devoid of merit; he complains that the instruction unfairly refers to "the truth of the facts" in a prior statement, without telling the jury it could also consider the falsity of the statement. However, the instruction in no way directs the jury to accept prior statements as the truth; it merely covers the hearsay exceptions provided in Evidence Code sections 1235 and 1236, in a neutral fashion. (See *People v. Wilson* (2008) 43 Cal.4th 1, 20–21 [73 Cal.Rptr.3d 620, 178 P.3d 1113].)

CALJIC No. 2.24 told the jury: "Evidence of the character of a witness for honesty or truthfulness may be considered in determining his believability. If the evidence establishes that a witness's character for honesty or truthfulness has not been discussed among those who know him, you may infer from the absence of such discussion that such character trait is good."

Defense counsel specifically requested this instruction, explaining to the court that it would cover King's testimony that Delsie Noble "lies all the time." Counsel's choice here was plainly " ' "conscious and deliberate," ' " and it bars defendant from challenging the instruction on appeal. (*People v. Weaver, supra,* 26 Cal.4th at p. 970.) Again, in any event, his argument is meritless. Defendant faults the instruction for not referring to a witness's character for dishonesty or untruthfulness. He underestimates the common sense of jurors.

### G. *Instructions Bearing on the Standard of Proof*

Defendant challenges the constitutionality of a series of instructions, claiming they undermined the standard of proof beyond a reasonable doubt. (CALJIC Nos. 1.00, 2.01, 2.02, 2.21.2, 2.22, 2.27, 2.51, 8.83, 8.83.1.) He acknowledges that we have rejected his claims, but invites us to reconsider our previous opinions in light of the facts of this case. (*People v. Cleveland* (2004) 32 Cal.4th 704, 750–751 [11 Cal.Rptr.3d 236, 86 P.3d 302]; *People v. Crittenden* (1994) 9 Cal.4th 83, 144 [36 Cal.Rptr.2d 474, 885 P.2d 887]; see also, e.g., *People v. Cook, supra,* 40 Cal.4th at pp. 1361–1362.) Defendant gives no persuasive reason in logic or law for us to revisit these settled issues.

### H. *Sufficiency of the Murder Charge in the Information*

■ Defendant argues it was error to instruct the jury on first degree murder because the information charged him only with murder in violation of section 187, subdivision (a), which he characterizes as a statute defining second degree murder. Defendant claims the court lacked jurisdiction to try him for first degree murder. He recognizes that we have repeatedly held that an information charging murder in violation of section 187 is sufficient to support a first degree murder conviction. (*People v. Hughes* (2002) 27 Cal.4th 287, 369 [116 Cal.Rptr.2d 401, 39 P.3d 432], citing cases; see also *People v. Geier* (2007) 41 Cal.4th 555, 591 [61 Cal.Rptr.3d 580, 161 P.3d 104]; *People v. Carey* (2007) 41 Cal.4th 109, 131–132 [59 Cal.Rptr.3d 172, 158 P.3d 743].) However, he claims the rationale of these cases is irreconcilable with the holding of *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] (*Dillon*).

*Dillon* held that section 189 is a codification of the first degree felony-murder rule. (*Dillon, supra,* 34 Cal.3d at pp. 471–472.) Because there is only a single statutory offense of first degree murder (see, e.g., *People v. Geier, supra,* 41 Cal.4th at p. 591), defendant reasons that the relevant statute must be section 189, not section 187, which he construes as a definition of second

degree murder.[7] Defendant misreads both *Dillon* and the statutes. *Dillon* made it clear that section 189 serves *both* a degree-fixing function and the function of establishing the offense of first degree felony murder. (*Dillon*, at pp. 468, 471.) It defines second degree murder as well as first degree murder. Section 187 also includes both degrees of murder in a more general formulation. (*People v. Witt* (1915) 170 Cal. 104, 108 [148 P. 928].) Thus, an information charging murder in the terms of section 187 is "sufficient to charge murder in any degree." (*People v. Carey, supra*, 41 Cal.4th at p. 132.)

Defendant does not contend he lacked actual notice of the prosecution's theory of first degree murder. He does, however, assert that the information failed to allege all the facts necessary to justify the death penalty, making it defective under *Apprendi v. New Jersey* (2000) 530 U.S. 466, 476 [147 L.Ed.2d 435, 120 S.Ct. 2348]. The *Apprendi* claim is illusory; the information included special circumstance allegations that fully supported the penalty verdict.

I. *Jury Unanimity on the Type of Murder*

Defendant also argues that the court erred by failing to instruct the jury that it had to agree unanimously on whether he committed premeditated murder or felony murder.[8] Again, he acknowledges we have repeatedly rejected this argument, but asks us to reconsider it. (E.g., *People v. Nakahara* (2003) 30 Cal.4th 705, 712–713 [134 Cal.Rptr.2d 223, 68 P.3d 1190], citing cases; see also *People v. Geier, supra*, 41 Cal.4th at p. 592; *People v. Carey, supra*, 41 Cal.4th at pp. 132–133.) Defendant submits no cogent rationale for a different rule, however. The United States Supreme Court has held that a jury need not unanimously agree on whether the defendant committed premeditated or felony murder, and this rule has been widely adopted by state courts. (*Schad v. Arizona* (1991) 501 U.S. 624, 640–642 [115 L.Ed.2d 555, 111 S.Ct. 2491] (plur. opn. of Souter, J.), citing cases; *id.* at pp. 649–651 (conc. opn. of Scalia, J.).)

---

[7] Section 187 provides, in relevant part: "Murder is the unlawful killing of a human being, or a fetus, with malice aforethought."

Section 189 provides, in relevant part: "All murder which is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree. All other kinds of murders are of the second degree."

[8] Defendant cites the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and sections 7, 15, 16, and 17 of article I of the California Constitution.

Defendant attempts to distinguish *Schad* on the ground that Arizona courts have not deemed premeditation and the commission of a felony to be independent elements of murder, whereas California courts have sometimes employed the "element" terminology. The distinction is merely semantic. The Arizona murder statute at issue in *Schad* was substantially similar to section 189, and to the common law definition of murder in existence since "at least the early 16th century." (*Schad v. Arizona, supra*, 501 U.S. at p. 648 (conc. opn. of Scalia, J.); see *id.* at p. 629, fn. 1 (plur. opn. of Souter, J.); fn. 7, *ante*, at p. 1295.) Whether the mental states required for a conviction of first degree murder are described as "elements" (*People v. Nakahara, supra*, 30 Cal.4th at p. 712), "theories" (*ibid.*), or "alternative means of satisfying the element of *mens rea*" (*Schad v. Arizona, supra*, 501 U.S. at p. 632 (plur. opn. of Souter, J.)), the rule remains the same: the jury need only unanimously agree that the defendant committed first degree murder.

In any event, as the Attorney General notes, here the jury unanimously found that defendant murdered Contreras during the commission of a robbery. (See *People v. Cleveland, supra*, 32 Cal.4th at p. 751.)

### J. *The Failure to Instruct on Theft as a Lesser Included Offense*

Defendant contends the trial court erred by failing to instruct the jury on theft as a lesser included offense of robbery.[9] He claims there was substantial evidence that he formed the intent to steal only after shooting Contreras, in which case there would have been no robbery. "If intent to steal arose only after the victim was assaulted, the robbery element of stealing by force or fear is absent." (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055–1056 [60 Cal.Rptr.2d 225, 929 P.2d 544]; see also, e.g., *People v. Waidla* (2000) 22 Cal.4th 690, 737 [94 Cal.Rptr.2d 396, 996 P.2d 46].) However, the record in this case does not support defendant's argument.

Defendant relies on the following facts. The evidence showed that he returned to the park with a gun following a dispute with the men gathered there. He approached Calleros and tried to shoot him. When the gun failed to discharge, defendant fired a shot into the air. Calleros ran away and heard a single shot, followed by someone "screaming give me the money." Defendant asserts that Calleros's testimony "arguably constitutes evidence supporting the notion that an intent and attempt to steal arose only after the shooting of Contreras." However, given that defendant's first shot was into the air, and that Contreras was shot three times in quick succession, Calleros's testimony in no way suggests that the murder preceded any demand for money. Nor did

---

[9] He asserts violations of the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and sections 7, 15, and 16, of article I of the California Constitution.

the fact that defendant's first act upon his return was to assault Calleros tend to show that he did not also intend to rob the men in the park.

Defendant bases his argument primarily on the testimony of Reynaldo Villatoro, who said that defendant brought his arm down and shot at Contreras "maybe a second" after firing into the air. However, viewed in its entirety Villatoro's testimony is consistent with that of the other witnesses, all of whom agreed that a robbery was in progress when Contreras was shot. Villatoro testified that he was being robbed by defendant's companion when Contreras was shot, and that Reyes had already been robbed. Villatoro did not see anything being taken from Contreras, because he was paying attention to defendant's companion. He said that his money was taken before the final shot was fired at Contreras, and that after he was robbed the companion told defendant, "I have the money. Let's go." The two men then ran away.

It is true that, unlike the other witnesses, Villatoro did not observe any attempt to steal from Contreras, either before or after the shooting. It is also true that, in response to a series of questions that appeared to confuse him, Villatoro gave answers that, considered in isolation, might suggest Contreras was shot before Reyes and Villatoro were robbed. During cross-examination, Villatoro said Contreras was shot twice while standing and again as he was falling to the ground, at which time Villatoro stopped watching because he was being robbed by defendant's companion. The following exchange then took place:

"Q. Now, after the other person took your money, did he take somebody else's money?

"A. From Efren [Reyes].

"Q. Okay. Was that before or after you?

"A. Before me.

"Q. And was Don Julian [Contreras] already on the ground at this time?

"A. Yes.

"Q. Okay, some money was taken from Efren and you in that order?

"A Yes. What? Excuse me one moment. What do you mean in that order?

"Q. Well, the first person who had money taken was Efren?

"A. Yes.

"Q. And then money was taken from you?

"A. Yes."

Shortly thereafter, Villatoro confirmed that he was robbed by defendant's companion just as Contreras fell to the ground.

On this record, the jury could not reasonably have concluded that the shooting preceded the robbery. The witnesses gave varying accounts of who was robbed first; according to Sanchez, it was Villatoro; according to Juan Quijas, the first thing that happened when defendant approached the group was that "his friend started to take the money from everybody," but Quijas did not notice who the first victim was; according to Reyes, defendant and his companion first tried to take Contreras's wallet. What was clear from all the accounts was that the shooting occurred during the robbery. One statement by Villatoro indicating that Contreras was on the ground, already shot for the last time, when Reyes was robbed, did not constitute a substantial contradiction of the general account. Villatoro immediately made it clear that it was he who was being robbed as Contreras fell, and that Reyes had already been victimized.

■ "[T]he existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094]; accord, e.g., *People v. DePriest* (2007) 42 Cal.4th 1, 50 [63 Cal.Rptr.3d 896, 163 P.3d 896].) The evidence here did not require instruction on theft as a lesser included offense of robbery.[10]

---

[10] In his reply brief, defendant develops the argument that Villatoro's testimony would support a finding that defendant had no expectation that his companion would rob Reyes and Villatoro, and merely intended to shoot someone upon returning to the park. However, a speculative inference that depends on the jury ignoring substantial contrary evidence is not enough to require the court to instruct on a lesser included offense. (*People v. Waidla, supra*, 22 Cal.4th at p. 738; see also, e.g., *People v. DePriest, supra*, 42 Cal.4th at p. 50.) Here, all the other eyewitnesses testified that defendant personally participated in the robberies, and Villatoro did not see the entire transaction between defendant and Contreras. Defendant's gloss on Villatoro's version of the events is mere speculation.

### K. *The Defective Special Circumstance Instruction*

The court gave the following version of CALJIC No. 8.81.17:

"To find that the special circumstance, referred to in these instructions as murder in the commission of robbery, is true, it must be proved:

"1. The murder was committed while the defendant was engaged in the commission or attempted commission of a robbery *or*

"2. The murder was committed in order to carry out or advance the commission of the crime of robbery. In other words, the special circumstance referred to in these instructions is not established if the robbery or attempted robbery was merely incidental to the commission of the murder." (Italics added.)

Defendant correctly observes that use of the disjunctive "or" between the enumerated paragraphs was erroneous.[11] (*People v. Prieto* (2003) 30 Cal.4th 226, 256 [133 Cal.Rptr.2d 18, 66 P.3d 1123].) The court replaced "and" with "or" at the prosecutor's request, and with defense counsel's agreement. The Attorney General contends counsel's acquiescence forfeited defendant's claim on appeal. However, "[t]he invited error doctrine will not preclude appellate review if the record fails to show counsel had a tactical reason for requesting or acquiescing in the instruction. [Citations.]" (*People v. Moon* (2005) 37 Cal.4th 1, 28 [32 Cal.Rptr.3d 894, 117 P.3d 591].) Here, as in *Moon*, the record shows no tactical reason, and therefore we do not apply the invited error doctrine. (*Ibid.*)

 The error is reversible unless it was harmless beyond a reasonable doubt. (*People v. Prieto, supra*, 30 Cal.4th at pp. 256–257.) Defendant contends the second paragraph of CALJIC No. 8.81.17 is a required element of the felony-murder special circumstance, which must be found true by the jury. We have rejected that view. The second paragraph of the instruction does not set out a separate element of the special circumstance; it merely clarifies the scope of the requirement that the murder must have taken place "during the commission" of a felony. (*People v. Monterroso* (2004) 34 Cal.4th 743, 766–767 [22 Cal.Rptr.3d 1, 101 P.3d 956]; *People v. Kimble* (1988) 44 Cal.3d 480, 501 [244 Cal.Rptr. 148, 749 P.2d 803].) "Thus, unless the evidence supports an inference that the defendant might have intended to murder the victim without having an independent intent to commit the specified felony, there is no duty to include CALJIC No. 8.81.17's second paragraph. [Citations.]" (*Monterroso*, at p. 767.)

---

[11] Defendant claims violation of his rights to due process and trial by jury under the Sixth and Fourteenth Amendments to the federal Constitution.

Here, of course, the second paragraph was presented to the jury as an alternative, not as a clarification of the first paragraph. Defendant notes this permitted the jury to find the special circumstance true based only on a finding that the murder occurred while he was engaged in the commission of a robbery, without making the further finding that the murder was committed to carry out or advance the robbery. Relying on the same evidence underlying the lesser included offense argument discussed in part II.J., *ante*, at pages 1296–1298, defendant claims the record supports an inference that he intended to murder Contreras without intending to steal from him until after the shooting occurred. However, neither paragraph of the instruction reflected defendant's after-acquired-intent theory. If the murder were committed while he was engaged in robbery, under the first paragraph, the intent to rob would already have been formed, just as it would have been if the murder were committed to carry out the robbery under the second paragraph. In any event, the evidence did not support defendant's theory, as discussed above in part J.

The defect in the instruction clearly did not affect the verdict. In addition to returning a true finding on the felony-murder special circumstance, the jury found defendant guilty of robbing Contreras. The evidence simply did not support the notion that the robbery was somehow incidental to the murder. Defendant makes much of the fact that he tried to shoot Calleros before any robbery attempt was made. However, by all accounts a robbery or robberies were being committed when he shot Contreras. By most accounts, Contreras was shot after he resisted. In addition to the eyewitness testimony, three witnesses (James, Noble, and King) testified or gave statements to the police to the effect that defendant told them he shot a Mexican who resisted when defendant tried to take his money. On this record, the failure to give CALJIC No. 8.81.17 in the conjunctive was harmless beyond a reasonable doubt.

### L. *The Refusal to Remove Juror G.*

#### 1. *Background*

On the morning of the first day of the penalty phase, the clerk informed the court that a juror had reported receiving death threats. The court met with the juror, P.G., in chambers. Both counsel were present, but not defendant. Juror G. said that in a telephone conversation that morning, his father told him he had received a death threat the previous night. A male caller had asked for Mr. G., and told the juror's father "we are going to kill you. We are going to shoot you six times in the stomach and you are going to be dead." Juror G. said he had been living with this parents until a month ago, was fearful for his family, and believed the threat was related to this case. He noted that some witnesses had testified that Contreras was shot in the stomach.

Juror G. said he did not think he would have a difficult time sitting on the jury for the penalty phase, or that the incident "would influence me one way or the other." However, he was concerned for his family and requested "some precautions possibly in that regard." Asked if he believed defendant might be responsible for the threat, Juror G. said "I really have no way of knowing." It was decided that he should call his father back to get more details, since his earlier conversation was a general one. After speaking with his father, Juror G. reported that the caller had asked for "Nick," not for Mr. G. The juror said the telephone number was listed under Nick G., his father's name. His father could not distinguish the race of the caller. When he identified himself as Nick, the caller had threatened to "shoot you dead." His father asked why, and the man said "you know why." After his father said he did not understand, the caller threatened to shoot him six times in the stomach. The juror's father told the caller he was crazy, and hung up.

Juror G. told the court he "honestly believe[d] that it would not" affect his deliberations, but repeated that he would like "some type of protection [to] be given to my family." Defense counsel asked if his neutrality might be compromised in the absence of such protection. The juror responded that it would not, but that he might be distracted. The court asked if his ability to be fair to defendant would be impaired, assuming the threat came from "somebody that knows something about this case." The juror said it would not.

The court asked the district attorney's office to investigate the incident and look into providing whatever protection was appropriate for Juror G.'s family. It assured the juror that the matter would be taken seriously. The prosecutor said she would contact the police, and defense counsel agreed. The juror then left chambers. The prosecutor expressed reluctance to excuse the juror, because if the threat was related to this case that would be precisely the result the caller wanted to achieve, and would leave only two alternate jurors. She thought the incident might tend to prejudice Juror G. either way in his deliberations, but asked that he not be removed.

Defense counsel moved to exclude the juror, based on the juror's belief that the threat was related to the case and on his fear for his family. The court noted that the juror had been "very steadfast" about his ability to be fair. The court was also concerned about the possibility that a series of jurors might be threatened for the purpose of removing them from the panel. Defense counsel argued that the threat, coming several days after the guilty verdict, would effectively become an illegitimate aggravating factor in Juror G.'s mind. The court decided to bring the juror back in to admonish him, but stated that a

threatening telephone call alone was not grounds for dismissing a juror. The court said it would ask Juror G. again about his ability to set the incident aside during his deliberations, and "if he says yes, he can, I have to take him at his word. If he says no, then that is a different story." The court discussed with counsel the possibility of sequestering the jury, but decided such a step would be premature.

Juror G. returned. The court determined that he had not discussed the incident with any other juror, and instructed him not to do so. It then told Juror G. that the threat could not be attributed to defendant. The juror said he understood, and that his primary concern was for his family's safety. In response to the court's admonition not to let the matter affect his deliberations in the penalty phase, Juror G. stated: "If I thought for a moment, your Honor, that it would affect me in any way whatsoever as to my ability as a juror, I would be the first to tell you that I can't any longer serve on this case." He assured the court that he understood the seriousness of the jury's task. The court said that steps would be taken "to try to give every assurance to your family," but that the court needed to be satisfied that Juror G. would be able to exclude the incident from his deliberations. The juror repeated that he would have told the court if he felt his ability to serve on the jury would be impaired. He said he had thought the matter through, and since he did not know where the threat came from he would adopt the "perception . . . of a neutral juror like it never happened."

The juror provided his father's address and telephone number for purposes of investigating the threat. He asked that defendant not be informed of the threat, because if "hypothetically" it was defendant or someone he knew who was behind it, that information would confirm that the threat had reached the juror's family, given that there were several listings for his surname in the telephone book. After the juror was excused, however, the court expressed concern about intruding into discussions between counsel and his client, and merely asked counsel to "use your professional discretion within the bounds of ethical consideration as to how much detail you want to discuss with [defendant]." Counsel agreed with the prosecutor that it would be appropriate to describe the incident as "an attempt to contact a juror."

Later the same morning, the prosecutor advised the court and counsel that the threat had been investigated. Detective Stewart learned that Juror G.'s father had made a police report about a car blocking a driveway. The car turned out to be stolen, the driver was charged, and the father was a witness in the case, which was scheduled for a preliminary hearing the next week. He was identified as "Nick G." on the subpoena. Because the caller had asked for "Nick," the prosecutor concluded it was more likely that the threat arose from the other case. The juror was again brought into chambers, and informed of

these developments. He had spoken with his father, who said the detective had told him the threat was probably related to the case in which the father was a witness. The court agreed, and said it wanted "to set your mind at rest, so that you'll be aware of all of the information regarding the telephone call. It does not appear that it is related to this case." Juror G. responded, "okay."

The court's refusal to dismiss Juror G. was among the grounds on which defendant sought a new trial. The court denied the new trial motion.

### 2. *Analysis*

Defendant contends the court's refusal to excuse Juror G. denied him the right to a fair trial by an impartial jury under the federal and state Constitutions.[12] "An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it" ' [citations]." (*In re Hamilton* (1999) 20 Cal.4th 273, 294 [84 Cal.Rptr.2d 403, 975 P.2d 600].) A defendant is "entitled to be tried by 12, not 11, impartial and unprejudiced jurors. 'Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced.' [Citations.]" (*People v. Holloway* (1990) 50 Cal.3d 1098, 1112 [269 Cal.Rptr. 530, 790 P.2d 1327], disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588].)

"A sitting juror's involuntary exposure to events outside the trial evidence, even if not 'misconduct' in the pejorative sense, may require . . . examination for probable prejudice. Such situations may include attempts by nonjurors to tamper with the jury, as by bribery or intimidation. [Citations.]" (*In re Hamilton, supra,* 20 Cal.4th at pp. 294–295.) "[T]ampering contact or communication with a sitting juror . . . usually raises a rebuttable 'presumption' of prejudice. [Citations.]" (*Id.* at p. 295.) "Still, whether an individual verdict must be overturned for jury misconduct or irregularity ' " 'is resolved by reference to the substantial likelihood test, an objective standard.' " ' [Citation.] Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant. [Citations.]" (*Id.* at p. 296.) We independently determine whether there was such a

---

[12] He cites the Sixth and Fourteenth Amendments to the federal Constitution, and article I, section 16 of the California Constitution.

reasonable probability of prejudice. (*People v. Danks* (2004) 32 Cal.4th 269, 303 [8 Cal.Rptr.3d 767, 82 P.3d 1249].)

Defendant contends the trial court erred by (1) failing to acknowledge the presumption of prejudice arising from the threat; (2) considering the possibility that the person or persons behind the threat might be able to obtain the dismissal of a series of jurors by making threats; (3) accepting the assurances of Juror G. that he would remain impartial; (4) ignoring the inherently prejudicial nature of the threat; and (5) exacerbating that prejudice by informing Juror G. that the district attorney's office would investigate the matter and take steps to protect his family. However, the record does not reflect a substantial likelihood that Juror G. harbored an actual bias against defendant.

The trial court was not required to expressly declare its awareness of presumed prejudice; it did so implicitly by holding a prompt hearing to explore the circumstances of the threat and the possibility of bias, which is the required procedure for handling a presumptively prejudicial incident of juror tampering. (*Smith v. Phillips* (1982) 455 U.S. 209, 215–216 [71 L.Ed.2d 78, 102 S.Ct. 940]; *In re Carpenter* (1995) 9 Cal.4th 634, 647–648 [38 Cal.Rptr.2d 665, 889 P.2d 985].) The court's concern that the person making the threat may have been attempting to force a mistrial was neither the controlling consideration in its decision to allow Juror G. to remain on the jury, nor a forbidden consideration. "Our system of justice has not delegated to every reprobate the power to effect a mistrial. A trial may proceed if the court, after considering factors such as the communication's nature, the jurors' responses, and the curative ability of instructions [citation], finds that the jury can (and will) remain impartial and render a verdict based solely on the evidence, not the improper contact." (*United States v. Williams* (7th Cir. 1984) 737 F.2d 594, 612; see also *U.S. v. Williams* (D.C. Cir. 1987) 262 U.S. App.D.C. 112 [822 F.2d 1174, 1190], superseded by rule on other grounds as stated in *U.S. v. Caballero* (D.C. Cir. 1991) 290 U.S. App.D.C. 235 [936 F.2d 1292, 1298–1299].)

Juror G. repeatedly and unequivocally stated that his ability to deliberate impartially would not be affected by the threat. Courts may properly rely on such statements to determine whether a juror can maintain his or her impartiality after an incident raising a suspicion of prejudice. (*Smith v. Phillips, supra*, 455 U.S. at pp. 215, 217, fn. 7; *Tanner v. United States* (1987) 483 U.S. 107, 122–123 [97 L.Ed.2d 90, 107 S.Ct. 2739]; cf. *People v. Guerra, supra*, 37 Cal.4th at pp. 1158–1159; *People v. Beeler* (1995) 9 Cal.4th 953, 972–975 [39 Cal.Rptr.2d 607, 891 P.2d 153].) Defendant contends the court improperly assumed that it had to accept Juror G.'s assurances, twice stating "I have to take him at his word." However, the court's first such comment

was clearly a conclusion based on its observation of the juror's unequivocal declarations that he could be fair in his deliberations. The second comment, anticipating the juror's reaction after further admonishment, is reasonably understood as following from the court's earlier observations, rather than as a blind commitment to accept the juror's promises regardless of their credibility. The trial court was in the best position to observe Juror G.'s demeanor. We defer to that court's credibility determinations when supported by substantial evidence, and Juror G.'s emphatic and repeated assurances were substantial. (*Guerra, supra,* at p. 1158; *People v. Danks, supra,* 32 Cal.4th at p. 304.)

Defendant's claim that the threat was simply too inherently prejudicial to be disregarded is undermined by the surrounding circumstances, both those developed when Juror G. was first questioned and those revealed by the investigation. Although Juror G. initially reported that the caller asked for "Mr. G.," when he called his father for more details he learned that the man had asked for "Nick," his father's name. Juror G.'s first name had been read in open court when the guilt phase verdicts were returned, because he signed the verdicts as foreman.[13] Thus, the fact that the caller asked for "Nick" immediately diminished the likelihood that the threat was related to defendant's case. When it was then discovered that Juror G.'s father was identified as a prosecution witness named "Nick G." on a subpoena in another case coming up for a hearing the following week, the chances of a connection became so remote as to dispel the presumption of prejudice.[14] (See *In re Hamilton, supra,* 20 Cal.4th at pp. 305–306.)

Defendant argues that whether or not the threat was related to his case, the court prejudiced Juror G. by telling him the district attorney would investigate and take steps to protect his family. Defendant claims this inevitably tended to dispose the juror favorably toward the prosecution. It would have been preferable for the court to avoid informing Juror G. that the prosecutor would take the lead on this matter. However, Juror G. would naturally expect the state to respond to his report, and the fact that the investigation quickly yielded a strong reason to believe that his family was not targeted because of his service on the jury mitigated any prejudice that might have resulted from a belief that the district attorney's office was protecting him from defendant or someone acting on defendant's behalf. Defense counsel raised no objection, so the court had no occasion to admonish the juror not to draw any untoward inferences from the prosecutor's role in the investigation.

---

[13] Juror G. did not serve as foreman for the penalty phase.

[14] Defendant makes much of the prosecutor's response when the court proposed telling Juror G. that the threat "has nothing to do with this case." The prosecutor said, "[w]ell, 'that we think.' I mean, we're nowhere sure of that." The facts on the record speak for themselves, however, and the prosecutor's caution does not establish prejudice.

We conclude that under the totality of the circumstances surrounding the threat against Juror G.'s father, there is no substantial likelihood that the juror was actually biased against defendant. (See *People v. Danks, supra*, 32 Cal.4th at p. 303.)

## M. *Defendant's Absence from Certain Proceedings*

■ Defendant contends he was denied the right to be present at three critical stages of his trial. A criminal defendant's right to be personally present at trial is protected by the confrontation clause of the Sixth and Fourteenth Amendments to the federal Constitution, by article I, section 15 of the California Constitution, and by sections 977 and 1043.

Under the Sixth Amendment's confrontation clause, a defendant has the right to be personally present at any proceeding in which his appearance is necessary to prevent "interference with [his] opportunity for effective cross-examination." (*Kentucky v. Stincer* (1987) 482 U.S. 730, 744–745, fn. 17 [96 L.Ed.2d 631, 107 S.Ct. 2658]; see *People v. Cole, supra*, 33 Cal.4th at p. 1231.) The Fourteenth Amendment guarantees the right to be present as a matter of due process at any "stage . . . that is critical to [the] outcome" and where the defendant's "presence would contribute to the fairness of the procedure." (*Kentucky v. Stincer, supra*, 482 U.S. at p. 745; see *Cole*, at p. 1231.)

The state constitutional right to be present at trial is generally coextensive with the federal due process right. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1357 [65 Cal.Rptr.2d 145, 939 P.2d 259]; *United States v. Gagnon* (1985) 470 U.S. 522, 526 [84 L.Ed.2d 486, 105 S.Ct. 1482].) This court has made it clear that neither the state nor the federal Constitution, nor the statutory requirement that a defendant be present at "all . . . proceedings" (§ 977, subd. (b)(1)),[15] provides a criminal defendant with the right to be personally present in chambers or at bench discussions outside the jury's presence on questions of law or other matters as to which his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him. (*People v. Rogers, supra*, 39 Cal.4th 826, 855; *People v. Ochoa* (2001) 26 Cal.4th 398, 434–435 [110 Cal.Rptr.2d 324, 28 P.3d 78], abrogated on another point as noted in *People v. Prieto, supra*, 30 Cal.4th at p. 263, fn. 14; *People v. Waidla, supra*, 22 Cal.4th 690, 742; *People v. Jackson* (1980) 28 Cal.3d 264, 309 [168 Cal.Rptr. 603, 618 P.2d 149], disapproved on another point *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3 [103 Cal.Rptr.2d 23, 15 P.3d 243].)

---

[15] Section 1043, subdivision (b)(2) bars a defendant in a capital case from being voluntarily absent from trial. No issue of voluntary absence is presented here.

 Defendant claims his presence might have made a difference in the outcome of various hearings held outside the presence of the jury.[16] However, none of these hearings were critical to his opportunity to defend, and defendant's arguments that he could have contributed to the fairness of the proceedings amount to no more than speculation. (See *People v. Cole, supra,* 33 Cal.4th at p. 1232.)

### 1. *The Discussion of Threats Against Robert James*

Defendant contends he was entitled to be present for the discussion between the court and counsel regarding the threats against prosecution witness Robert James (see pt. II.D.1., *ante*, at pp. 1287–1288). In this bench conference, for which the jury was excused and defendant was absent, the court offered to allow counsel to stipulate that defendant had nothing to do with his sister's threat against James. Defense counsel was unwilling to stipulate, repeatedly protesting that he had no firsthand knowledge of the threat. Counsel was concerned that a stipulation would establish the threat as a fact. The prosecutor offered to stipulate merely that James had told Detective Stewart about the threat, but defense counsel ultimately decided he would rather question the detective about James's failure to disclose the threat earlier, in an attempt to suggest that it "never happened."

Defendant contends the stipulation would have protected him against the damaging evidence of the threat. He asserts that if he had been present, he could have assured his counsel he had nothing to do with the threat, and insisted on accepting the stipulation. However, counsel displayed no concern over whether defendant was himself involved in the threat; his preoccupation was with the evidence establishing the fact of the threat. There is no reasonable, substantial likelihood that if defendant had been present, counsel would have made a different strategic decision on how to counter the threat evidence, which was clearly relevant to James's state of mind when he testified. The right to be present does not extend to argument over such evidentiary matters. (See *People v. Box* (2000) 23 Cal.4th 1153, 1191–1192 [99 Cal.Rptr.2d 69, 5 P.3d 130]; *People v. Holloway, supra,* 50 Cal.3d at p. 1116, disapproved on other grounds in *People v. Stansbury, supra,* 9 Cal.4th at p. 830, fn. 1.) Defendant fails to show how his presence would have contributed to the fairness of the procedure during the discussion of the threat evidence, or that his opportunity for effective cross-examination was interfered with. Accordingly, he fails to establish any violation of the controlling constitutional standards.

---

[16] He claims violation of his rights to due process, to be present at trial, and to a reliable penalty determination under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

In any event, after the detective testified, the court unequivocally instructed the jury that the threat could not be attributed to defendant, achieving the same effect as the stipulation that counsel rejected. Defendant claims a stipulation would have prevented the prosecutor from implying that he was involved (see pt. II.D.3., *ante*, at pp. 1289–1290). However, any such implication was equally refutable by reference to the court's limiting instruction.

### 2. The Hearing on Sealing the Guilt Verdicts and Excusing a Juror

Late on the afternoon of June 9, 1993, the jury notified the court that it had reached a unanimous verdict on five of the six counts, but could not agree on the final count or on one special circumstance allegation. After some jurors indicated that further deliberation might be helpful, the court sent the jury back to write down any requests for clarification. While the jury was doing this, the prosecutor asked the court whether it would seal the verdicts that had been reached at the end of the day. The court said it would, if the jury was going to continue its deliberations. Otherwise, it would "just go ahead and take the verdict." The jury subsequently reported that the further instructions it received from the court were helpful. Accordingly, the court told it to return the following day. Defendant was present during these proceedings.

The following day, June 10, the judge was absent due to a previous engagement. By midmorning, the jury had reached an impasse on the remaining count and the special circumstance allegation. The clerk informed counsel of the situation, and telephoned the judge. By agreement of counsel and order of the court, the verdicts were sealed and the jury was excused. That afternoon, the clerk received a telephone call from a coworker of one of the jurors, reporting that the juror was discussing the verdicts and deliberations at her workplace, including which of the jurors was causing the jury to hang. The clerk reported this incident by telephone to the judge.

On June 11, the court discussed the situation in chambers with counsel, apparently in defendant's absence. The court expressed no doubt that the juror had engaged in misconduct that would prevent her from sitting for the penalty phase, if there was one. It proposed questioning the juror to see if she admitted the misconduct, and if she had spoken to anyone else before the verdicts were sealed, in which case the verdicts would be tainted and the jury would have to begin again after an alternate was seated. If she had committed no misconduct before the verdicts were sealed, the court believed the verdicts would be valid. Defense counsel expressed doubt about the validity of the verdicts in any event, and urged the court to seat an alternate and commence deliberations anew. The prosecutor disagreed.

The juror, R.S., was called into chambers, and readily admitted discussing the case with her coworkers. She had thought the case was over. She apologized, and assured the court repeatedly that she had not spoken about it with anyone outside the jury room until after the verdicts were sealed the previous day. The court conferred with counsel, both of whom agreed that Juror S. had been candid. The court decided the misconduct had not tainted the verdicts. With the consent of both counsel, Juror S. was excused from further service on the jury.

Defendant argues that his right to be present was violated when the verdicts were sealed and then accepted by the court in his absence, and when the court discussed the misconduct of Juror S. with counsel alone and determined that she must be dismissed.

As to the taking of the verdicts, defendant claims he could have objected to their sealing in the first place on June 10, or asked the court to inform the jurors that they could reconsider the verdicts. However, defendant was present on June 9 when the verdicts were sealed at the end of the day, and made no objection or request for reconsideration. The jury was clearly at an impasse on the morning of June 10, abandoning its deliberations at 10:45 a.m. The judge was absent, and there was no alternative but to seal the verdicts at that point. Regarding the dismissal of Juror S., defendant asserts that he might have asked the court to excuse the juror before the verdicts were recorded, and seat an alternate for new guilt deliberations. Defense counsel made that very request. The court rejected the idea, and it is inconceivable that defendant's presence would have made any difference. This was not a critical stage at which defendant's presence was necessary as a matter of fairness. (*Kentucky v. Stincer, supra*, 482 U.S. at p. 745; *People v. Perry* (2006) 38 Cal.4th 302, 312 [42 Cal.Rptr.3d 30, 132 P.3d 235].)

Nor was defendant's presence required during the discussion of Juror S.'s misconduct, which led to her excusal with the consent of counsel. The dismissal of a juror for misconduct is not a matter for which the defendant must be present. (*People v. Johnson* (1993) 6 Cal.4th 1, 17–20 [23 Cal.Rptr.2d 593, 859 P.2d 673], disapproved on another point in *People v. Rogers, supra*, 39 Cal.4th at p. 879; *People v. Abbott* (1956) 47 Cal.2d 362, 371–372 [303 P.2d 730]; *People v. Feagin, supra*, 34 Cal.App.4th at pp. 1438–1439.) Defendant identifies no particular circumstance that might have required his presence. He asserts he was deprived of the chance to make his own assessment of the juror's credibility and he could have objected to counsel's consent to her dismissal. However, the misconduct was clear and court's decision was an obvious one.

### 3. *The Hearings on the Threat to Juror G.'s Family*

Defendant also contends he had the right to be present at the hearings during which Juror G. reported the threat against his father, and the court decided to allow G. to remain on the jury. (See pt. II.L.1., *ante*, at pp. 1300–1303.) Defendant argues that he himself was the subject of these hearings, and that he was entitled to be there to protect his interests, particularly since, he asserts, his counsel failed to do so effectively.

The subject of the hearings was the telephone threat received by the juror's father. Juror G. was clearly concerned with the possibility that the threat might be related to defendant or someone he knew. He requested that defendant not be informed of the episode so as not to confirm that the threat had been successfully communicated, in case defendant were "hypothetically" involved in some way. The juror would obviously have objected to defendant's presence. Defendant had no right to attend such confidential in-chambers discussions. (*United States v. Gagnon, supra*, 470 U.S. at p. 527; *People v. Ochoa, supra*, 26 Cal.4th at pp. 435–436, abrogated on another point as noted in *People v. Prieto, supra*, 30 Cal.4th at p. 263, fn. 14.) He argues that he could have objected to Juror G's. remaining on the jury, or in the alternative assured the juror that he was not involved in the threat. However, as noted just above, it is settled that the removal of a juror is not a matter for which a defendant is entitled to be present. Assurances from defendant were unlikely to assuage the juror's concerns, which in any event were alleviated by the investigation that showed the threat was unrelated to this case. Finally, any direct colloquy between defendant and a juror would clearly have been inappropriate.

### N. *Alleged Errors Concerning the Evidence in Aggravation*

### 1. *The Evidence of Juvenile Threats*

Defendant challenges the trial court's admission of evidence that he threatened school police officers Stokes and Magdaleno when they detained him in the security office of San Fernando High School in 1982.[17] (See the statement of facts, *ante*, at pp. 1278–1279.) The trial court deemed the evidence sufficient to establish threats against public officers under section 71, amounting to "criminal activity" for purposes of the aggravating factor provided by section 190.3, factor (b). Defendant claims the evidence failed to establish either his intent to interfere with the performance of official duties or his ability to carry out the threats.

---

[17] As to all claims concerning the evidence in aggravation, defendant asserts violation of the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

Defendant contends there was nothing to suggest his threats were meant to obtain his release from custody. The claim is meritless. His demand to know why he was being detained, just before he began threatening Magdaleno, and his subsequent attempt to walk out the door sufficiently established his intent to interfere with the officers' efforts to detain him.

■ Defendant argues that since he was handcuffed and in custody when he made the threats, he was in no position to carry them out. He relies on our decisions in *People v. Tuilaepa* (1992) 4 Cal.4th 569, 590 [15 Cal.Rptr.2d 382, 842 P.2d 1142], and *People v. Boyd* (1985) 38 Cal.3d 762, 777 [215 Cal.Rptr. 1, 700 P.2d 782]. However, in *People v. Dunkle* (2005) 36 Cal.4th 861, 919–920 [32 Cal.Rptr.3d 23, 116 P.3d 494], we explained that *Tuilaepa* and *Boyd* failed to recognize that section 71 does not require a present ability to carry out the threat. "Indeed, the statute expressly provides that the threat may be communicated by 'telephone, telegraph, or letter' (§ 71)—clearly indicating the Legislature did not intend to require that the defendant have the capability to inflict the threatened unlawful injury *immediately*." (*Dunkle*, at p. 920.) It is sufficient if the defendant made a threat with the requisite intent and it reasonably appears to the recipient that the threat could be carried out. (*Ibid.*)[18]

Thus, it is immaterial that defendant may have lacked the ability to act on his threats immediately. He told the officers that he knew or could find out where they lived, and that he would kill them. He also threatened to kill Stokes's wife and burn down his house. The officers testified that they took these threats seriously, and took precautions against them. This was sufficient to establish a reasonable appearance that the threats could be carried out.

## 2. *The Jury Instruction on the Threats*

Defendant contends the jury instruction on the threats discussed above improperly removed from the jury's consideration the question whether his conduct amounted to a criminal act. The court gave the jury a version of CALJIC No. 8.87, as follows:

"Evidence has been introduced for the purpose of showing that the defendant Lanell Harris has committed the following criminal acts: Threatening a School Officer and Robbery which involved the express or implied use of force or violence or the threat of force or violence. Before a juror may consider any of such criminal acts as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the

[18] Defendant also relies on *People v. Wright* (1990) 52 Cal.3d 367, 425–426 [276 Cal.Rptr. 731, 802 P.2d 221]. However, *Wright* merely followed *Boyd*, and is not persuasive for the reasons noted above.

defendant, Lanell Harris, did in fact commit such criminal acts. A juror may not consider any evidence of any other criminal acts as an aggravating circumstance.

"It is not necessary for all jurors to agree. If any juror is convinced beyond a reasonable doubt that such criminal activity occurred, that juror may consider that activity as a fact in aggravation. If a juror is not so convinced, that juror must not consider that evidence for any purpose."

Defendant complains that the jury was told the threats were criminal in nature. His reading of the instruction is unduly strained. It did not inform the jury that the acts he committed were necessarily criminal threats. The references to "such criminal acts" or "activity" in the latter parts of the instruction clearly referred back to the opening sentence, which explained that the jury was to consider the evidence that the prosecution offered for the purpose of proving the offense. Thus, the jury would reasonably have understood that it was to weigh the evidence to decide whether it showed, beyond a reasonable doubt, that defendant committed the criminal act of threatening a school officer. (See *People v. Monterroso, supra,* 34 Cal.4th at p. 793; *People v. Nakahara, supra,* 30 Cal.4th at p. 720.)

### 3. *The Voluntary Intoxication Instructions*

The court instructed the jury on the specific intent required for the uncharged crime of threatening a school officer. With the assent of both counsel, the court also gave the jury a version of CALJIC No. 4.21 on voluntary intoxication, as follows:

"In the uncharged crime of Threatening a School Official a necessary element is the existence in the mind of the defendant of the specific intent as set forth elsewhere in these instructions.

"If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in determining whether defendant had such specific intent.

"If from all the evidence you have a reasonable doubt whether the defendant formed such specific intent you must find that he did not have such specific intent."

The court followed this instruction with the definition of voluntary intoxication provided by CALJIC No. 4.22:

"Intoxication of a person is voluntary if it results from the willing use of any intoxicating liquor, drug or other substance, knowing that it is capable of an intoxicating effect or when he willingly assumes the risk of that effect.

"Voluntary intoxication includes the voluntary ingestion, injecting or taking by any other means of any intoxicating liquor, drug or other substance."

Defendant contends these two instructions are irreconcilable and confusing. He claims the jurors were likely to conclude that his willing assumption of the risk of intoxication could not have diminished the criminality of his conduct. To the extent this claim was not forfeited by defendant's failure to object or seek clarification below (see *People v. Cleveland, supra,* 32 Cal.4th at p. 749), it is meritless. The jury was correctly informed that intoxication was relevant to its determination of whether defendant had formed the requisite specific intent, even if he was willing to accept the risk of intoxication. We considered and rejected a claim similar to defendant's in *People v. Cain* (1995) 10 Cal.4th 1 [40 Cal.Rptr.2d 481, 892 P.2d 1224], concluding there was no likelihood that CALJIC Nos. 4.21 and 4.22 misled the jury in its consideration of the intent requirement. (*Cain,* at pp. 38–39.)

### 4. *The Escape Instruction*

The jury was informed that defendant had pled guilty to a charge of escaping from a police officer. The court read to the jury an abbreviated and modified version of CALJIC No. 7.30, as follows:

"The defendant has been convicted of the crime of escape without force or violence, in violation of section 4532(b) of the Penal Code.

"Every person arrested and booked and charged with a felony who is under the lawful custody of an officer who escapes or attempts to escape from the lawful custody of such officer is guilty of the crime of escape without force or violence, in violation of Penal Code section 4532(b)."

The written instructions provided to the jury included the standard terminology from the form instruction referring to "[e]very *prisoner* arrested and booked and charged . . . ." (Italics added.) Defendant contends the failure to change "prisoner" to "person" in the written instructions violated his constitutional rights because the jury was likely to have inferred that he had escaped from state prison. Defendant forfeited this claim by failing to object below. The inconsistency between the oral and written instructions is trivial and did not even arguably affect his substantial rights. (§ 1259.) The evidence and argument made it plain that the escape was from the custody of a police officer, and both the oral and written instructions so specified.

### 5. *The "Clerk Had Been Stabbed" Testimony*

During the questioning of Jerome Van Tress, the salesman who observed defendant attacking a 7-Eleven clerk in 1984, Van Tress began to relate what

happened when he drove to a police station to report what he had seen. Defense counsel objected after Van Tress stated "the police officer at the desk said——." The prosecutor responded that "it may not be offered for its truth, we don't know what it is. So it might not be hearsay." The court allowed Van Tress to answer, subject to a motion to strike. Van Tress continued, "he said that the clerk had been stabbed." The court sustained defense counsel's objection and directed the jury to disregard the answer.

 Defendant argues that the court erred by failing to require the prosecutor to establish that Van Tress's testimony was not "offered to prove the truth of the matter stated" under the hearsay statute (Evid. Code, § 1200, subd. (a)), before permitting Van Tress to finish his statement. Defendant relies on cases discussing the necessity of proving the existence of a preliminary fact before proffered evidence is deemed admissible, under Evidence Code section 403. (E.g., *People v. Sanders* (1995) 11 Cal.4th 475, 514 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *People v. Pic'l* (1981) 114 Cal.App.3d 824, 859–860 [171 Cal.Rptr. 106], disapproved on another point in *People v. Kimble, supra*, 44 Cal.3d at p. 498.) These cases are inapposite; whether testimony is offered to prove the truth of the matter stated is not a preliminary fact, but an intrinsic part of the determination whether a statement is hearsay. In any event, the court's authority to allow a witness to answer on a provisional basis, subject to a motion to strike, is recognized in Evidence Code section 403 itself, as well as in other contexts. (Evid. Code, § 403, subd. (b); 3 Witkin, Cal. Evidence, *supra*, Presentation at Trial, § 388, p. 481.)

Nevertheless, we note that the better practice would have been to resolve the hearsay question before revealing the witness's statement to the jury. It is not unreasonable to expect advocates to know what evidence they are eliciting and to be prepared to defend its admissibility in advance. The prosecutor's excuse that "we don't know what it is" invited the court to go forward and hope to rectify any problem after the fact. Under the circumstances, however, defendant can show no prejudice.[19]

The jury was informed that defendant had admitted intentionally inflicting great bodily injury on the victim, and it heard Van Tress testify that he had seen "quite a bit of blood" on the floor of the 7-Eleven and on the sidewalk outside. The jury also learned, as we discuss next, that when defendant was arrested the same day, there was a bloody knife next to him. Thus, even assuming the jury would not have been able to follow the court's instruction to disregard Van Tress's hearsay testimony, in light of this other evidence the reference to stabbing was not in itself so prejudicial as to violate any fundamental right.

---

[19] He contends his rights to due process and a reliable penalty determination under the Sixth and Fourteenth Amendments to the federal Constitution were violated.

### 6. *The Bloody Knife Evidence*

Detective Richard Knapp testified that he and a colleague went to an apartment across the street from the 7-Eleven on the day of the robbery, following a lead. Inside they found defendant lying on the floor, next to a table on which there was a folding knife. The knife was closed. When Knapp examined it, he saw what appeared to be dried blood on the inside and outside of the handle.

Defendant contends this testimony was irrelevant to any statutory aggravating factor. The claim is meritless. The fact that defendant was found with a bloody knife not long after the robbery was relevant to prove "criminal activity by the defendant which involved the use or attempted use of force or violence" under section 190.3, factor (b). Defendant's arguments disputing the probative value of this evidence go to its weight, rather than its admissibility.

### 7. *General Objections to the Use of Unadjudicated Criminal Activity*

Defendant raises a number of general objections to the use of unadjudicated criminal activity as an aggravating factor under section 190.3, factor (b). We have consistently rejected these challenges.

Section 190.3, factor (b) is not unconstitutionally vague or overbroad. (*Tuilaepa v. California* (1994) 512 U.S. 967, 976–977 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Dunkle, supra,* 36 Cal.4th at p. 922.) Defendant contends our decisions construing this factor have resulted in procedural protections less rigorous than those provided to noncapital defendants. However, the authority to which he refers fails to support his assertion that penalty phase procedures are constitutionally required to be more stringent than other criminal procedures. (See *Ake v. Oklahoma* (1985) 470 U.S. 68, 87 [84 L.Ed.2d 53, 105 S.Ct. 1087] (conc. opn. of Burger, C. J.); *Eddings v. Oklahoma* (1982) 455 U.S. 104, 117–118 [71 L.Ed.2d 1, 102 S.Ct. 869] (conc. opn. of O'Connor, J.); *Lockett v. Ohio* (1978) 438 U.S. 586, 605–606 [57 L.Ed.2d 973, 98 S.Ct. 2954].) To the contrary, it is settled that defendants in capital cases are not similarly situated to noncapital defendants. Thus, the objection that section 190.3, factor (b) operates differently from noncapital procedures is meritless, as is defendant's equal protection claim. (*People v. Carey, supra,* 41 Cal.4th at p. 136; *People v. Blair* (2005) 36 Cal.4th 686, 754 [31 Cal.Rptr.3d 485, 115 P.3d 1145].)

The use of the same jury to determine guilt and to weigh the other-crimes evidence does not deprive defendants of an impartial jury. (*People v. Bolin*

(1998) 18 Cal.4th 297, 335 [75 Cal.Rptr.2d 412, 956 P.2d 374]; *People v. Avena* (1996) 13 Cal.4th 394, 428 [53 Cal.Rptr.2d 301, 916 P.2d 1000].) Defendant argues that his counsel was unable to adequately question prospective jurors during voir dire regarding the unadjudicated crimes, due to the risk of biasing them during the guilt phase, at which the other-crimes evidence was inadmissible. However, he provides no specific argument on this point, and elsewhere he concedes that the unadjudicated offenses "involved alleged robbery and threatened assaultive conduct" similar to the charged crimes. Because counsel was free to explore the prospective jurors' attitudes in regard to the charged crimes, defendant fails to demonstrate any prejudice, even if he could establish a constitutional violation.

Jury unanimity is not required with respect to unadjudicated criminal conduct. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1059 [63 Cal.Rptr.3d 82, 162 P.3d 596]; *People v. Michaels* (2002) 28 Cal.4th 486, 541–542 [122 Cal.Rptr.2d 285, 49 P.3d 1032].) Nor does expiration of the statute of limitations bar the use of such conduct as an aggravating factor. (*Barnwell*, at p. 1058 [citing cases].) Defendant cites *Johnson v. Mississippi* (1998) 486 U.S. 578, 585–586 [100 L.Ed.2d 575, 108 S.Ct. 1981], for the proposition that procedures governing consideration of other-crimes evidence at the penalty phase must conform to the constitutional standards governing proof of charged offenses. However, as we have pointed out, *Johnson* does not say that. (*Barnwell*, at p. 1058, fn. 15; *People v. Yeoman* (2003) 31 Cal.4th 93, 137–138 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

Juvenile misconduct may properly be introduced as evidence in aggravation. (*People v. Roldan* (2005) 35 Cal.4th 646, 737 [27 Cal.Rptr.3d 360, 110 P.3d 289]; *People v. Lewis, supra*, 26 Cal.4th at p. 378; *People v. Lucky* (1988) 45 Cal.3d 259, 295 [247 Cal.Rptr. 1, 753 P.2d 1052].)

### O. *The Absence of an Instruction Defining Life Without Parole*

The jury was given CALJIC No. 8.84, which stated in relevant part: "It is the law of this state that the penalty for a defendant found guilty of murder of the first degree shall be death or confinement in the state prison for life without the possibility of parole in any case in which the special circumstance alleged in this case has been specially found to be true." Similarly, CALJIC No. 8.88 informed the jury it was to "determine which of the two penalties, death or confinement in the state prison for life without the possibility of parole, shall be imposed on the defendant."

Defendant contends these instructions failed to adequately explain the meaning of "life without the possibility of parole," as required by *Kelly v. South Carolina* (2002) 534 U.S. 246 [151 L.Ed.2d 670, 122 S.Ct. 726],

*Shafer v. South Carolina* (2001) 532 U.S. 36 [149 L.Ed.2d 178, 121 S.Ct. 1263], and *Simmons v. South Carolina* (1994) 512 U.S. 154 [129 L.Ed.2d 133, 114 S.Ct. 2187].[20] We have rejected this argument many times, noting that the South Carolina instructions were defective because they failed to inform the jury of the defendant's parole eligibility status. (E.g., *People v. Martinez* (2003) 31 Cal.4th 673, 699 [3 Cal.Rptr.3d 648, 74 P.3d 748]; *People v. Smith* (2003) 30 Cal.4th 581, 635–636 [134 Cal.Rptr.2d 1, 68 P.3d 302].) The instructions here explicitly informed the jury that there would be no possibility of parole.

Defendant claims that during its deliberations, the jury demonstrated confusion over the available sentencing choices by sending a note asking for a definition of "Life without the possibility of parole/Death penalty." Before replying, the court inquired whether counsel had discussed the matter to work out an answer acceptable to both sides. The prosecutor responded that they had, and the answer was that the meaning of the terms was "exactly what they sound like; that there is no other definition of them." Defense counsel affirmed, "that's correct." The court asked, "so your proposal is the jury be given no further definition of life without parole or death?" Both counsel replied "yes." Accordingly, the jurors were called in and the court told them "those matters have been defined for you and there's really no need to define them further. They're in the materials that have been given to you and the court's instructions, and there's no need to further define them for you at this point."

Defendant complains that the court's answer was "essentially . . . no response at all," and amounted to ignoring the jury's request for a definition. He has waived this argument by specifically agreeing below to the court's handling of the jury's question. (*People v. Turner* (2004) 34 Cal.4th 406, 437 [20 Cal.Rptr.3d 182, 99 P.3d 505]; see also *People v. Martinez, supra,* 31 Cal.4th at p. 698.) In any event, his arguments lack merit. The court told the jury to follow the instructions it had been given on this point, and those instructions are "precisely accurate." (*People v. Smith, supra,* 30 Cal.4th at p. 635.) The common meanings of "life without the possibility of parole" and "death penalty" are obvious. (See *People v. Snow* (2003) 30 Cal.4th 43, 123 [132 Cal.Rptr.2d 271, 65 P.3d 749].) The jury's request, as defendant acknowledges, did not reflect failure to understand what the words meant as much as it demonstrated uncertainty that a life sentence would actually be carried out without defendant being released from prison.

It would have been proper for the court to tell the jury " 'to *assume* that whatever penalty it selects will be carried out' " or to give " 'a comparable

---

[20] He asserts violation of the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

instruction.' " (*People v. Snow, supra,* 30 Cal.4th at p. 123, quoting *People v. Kipp* (1998) 18 Cal.4th 349, 378–379 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) However, defendant did not request such an instruction. Nor was he prejudiced by the procedure to which he agreed. The court informed the jury in so many words to consult the instructions it was given, without looking for further definition. The instructions were plain and accurate. Considered on their own terms, as the jurors were directed to do, they left no room for doubt over defendant's eligibility for parole.

### P. *The Absence of an Instruction on Victim Impact Evidence*

■■■ Defendant claims the court should have given an instruction on the proper use of victim impact evidence, to prevent an unduly emotional response from the jury.[21] He proposed no such instruction below. Even if he had, we have "rejected the argument that a trial court must instruct the jury not to be influenced by emotion resulting from victim impact evidence. [Citations.]" (*People v. Carey, supra,* 41 Cal.4th at p. 134.) Defendant objects to certain arguments made by the prosecutor. He does not claim prosecutorial misconduct. Nevertheless, he asserts the remarks were so inflammatory the court should have given a cautionary instruction. Defense counsel was certainly free to respond to the prosecutor's victim impact arguments, and to request an instruction addressing them if he believed one was needed. However, defendant cites no authority for the proposition that the court must respond to closing argument by giving sua sponte limiting instructions.

### Q. *The Failure to Reinstruct at the Penalty Phase*

During the discussion of penalty phase instructions with counsel, the court was skeptical about the necessity of reinstructing the jury with the guilt phase instructions that were pertinent to the penalty deliberations. Ultimately, with the concurrence of counsel, the court decided not to reinstruct, but to give a general instruction telling the jury to follow those guilt phase instructions that applied to the penalty determination, excluding those prohibiting the consideration of sympathy for the defendant. The court noted that the jury would have the guilt phase instructions in written form.

Accordingly, the court read the following special instruction: "You are to be guided by the previous instructions given in the first phase of this case which are applicable and pertinent to the determination of penalty. However, you are to completely disregard any instructions given in the first phase which prohibited you from considering pity or sympathy for the defendant. In determining penalty, the jury may take into consideration pity and sympathy for the defendant."

---

[21] He cites the Sixth, Eighth, and Fourteenth amendments to the federal Constitution, as well as sections 7, 15, 16, and 17 of article I of the California Constitution.

Immediately before reading this instruction, however, the court gave the jury the standard version of CALJIC No. 8.84.1, which included the admonishment: "You must accept and follow the law as I state it to you. Disregard all other instructions given to you in other phases of this trial." This instruction was designed to be followed by all the instructions appropriate for the penalty phase. (See *People v. Steele* (2002) 27 Cal.4th 1230, 1255–1256 [120 Cal.Rptr.2d 432, 47 P.3d 225].)

Defendant contends the court erred by failing to reinstruct the jury with the applicable guilt phase instructions, and by giving it contradictory directions to disregard all former instructions, on the one hand, but to follow those that were applicable, on the other.[22] The court did indeed err. As we have held, if the court tells the jury to disregard the guilt phase instructions, "it must later provide it with those instructions applicable to the penalty phase." (*People v. Moon, supra,* 37 Cal.4th at p. 37.) We reiterate that trial courts should take pains to ensure that penalty phase juries are fully and properly instructed. (See *People v. Carter* (2003) 30 Cal.4th 1166, 1222 [135 Cal.Rptr.2d 553, 70 P.3d 981]; *Moon,* at p. 37, fn. 7.)

The Attorney General, while noting that defendant agreed to the instructional procedure below, does not contend the error was invited. But insofar as defendant claims the court should have reread the applicable guilt phase instructions, his counsel did indeed invite error. The prosecutor directly, and correctly, questioned whether the jury would be capable of modifying the written instructions from the guilt phase to fit the penalty phase issues. In particular, she noted that the circumstantial evidence instructions referred to findings of guilt, which would not be involved in the penalty deliberations. Defense counsel argued at length against reinstructing the jury, and requested that it receive only instructions on the elements of the uncharged crimes, to avoid confusion and the temptation to "relitigate the issues in guilt."

It is true that counsel did not ask the court to give CALJIC No. 8.84.1 in addition to the special instruction set out above. He merely acquiesced in the court's decision to give these inconsistent instructions. Thus, to the extent that error affected defendant's substantial rights, he is not barred from raising a claim of instructional error without an objection in the trial court. (*People v. Benavides* (2005) 35 Cal.4th 69, 111 [24 Cal.Rptr.3d 507, 105 P.3d 1099]; see also *People v. Moon, supra,* 37 Cal.4th at p. 37.) In any event, the instructions given by the court did not prejudice defendant under the circumstances of this case, as we shall explain.

While it was confusing for the jury to hear first that it was to "[d]isregard all other instructions given to you in other phases of this trial," and then that

---

[22] He asserts violation of his rights under the Eighth and Fourteenth Amendments to the federal Constitution.

it should "be guided by the previous instructions given in the first phase of this case which are applicable and pertinent to the determination of penalty," two factors operated to resolve the conflict as a practical matter. First, the jury was given the guilt phase instructions in written form, and would reasonably have understood that they could therefore consider them. Second, the prosecutor, in her closing argument, referred the jury to the "original" circumstantial evidence instructions as they applied to the question of whether defendant had used a knife in the 7-Eleven robbery. (See pt. II.N.5., 6., *ante*, at pp. 1313–1315.) She specifically mentioned the aspect of those instructions most favorable to defendant, stating: "If there are two reasonable interpretations of the evidence you must accept the one that favors the defendant." While the arguments of counsel are no substitute for instructions from the court, here the jury would surely have concluded from the prosecutor's argument that these guilt phase instructions were applicable at the penalty phase.

In arguing that the failure to reinstruct was prejudicial, defendant specifies only the circumstantial evidence instructions, CALJIC Nos. 2.01 and 2.02. He contends that, even if the jury did turn to the written instructions, it would not have deemed these particular instructions applicable because of their references to "guilt." However, as noted, the prosecutor incorporated these instructions in her argument on defendant's use of a knife. Regarding the uncharged offenses alleged in the penalty phase, common sense would have led the jury to consider the instructions in determining whether defendant had committed those crimes. Defendant relies on our discussion in *People v. Babbitt* (1988) 45 Cal.3d 660, 717–718 [248 Cal.Rptr. 69, 755 P.2d 253]. There, we reasoned that the jury would not have applied "the no-sympathy instruction (CALJIC No. 1.00)" because it "refers specifically to deciding a defendant's guilt or innocence." (*Babbitt*, at p. 717.) Here, by contrast, the jury *would* have applied the circumstantial evidence instructions both as a matter of logic and by reference to the prosecutor's argument incorporating them.

Defendant has failed to establish a reasonable possibility, or a reasonable doubt, that any instructional error involving the applicability of the guilt phase instructions affected the penalty verdict. (See *People v. Wilson, supra,* 43 Cal.4th at p. 28; *People v. Carter, supra,* 30 Cal.4th at pp. 1221–1222.)

R. *CALJIC No. 8.85*

Defendant claims the failure to delete inapplicable statutory factors from CALJIC No. 8.85, which identifies the factors that may be considered in mitigation or aggravation, violated his federal and state constitutional

rights.[23] We have repeatedly rejected this argument. (E.g., *People v. Cook, supra*, 40 Cal.4th at p. 1366; *People v. Anderson* (2001) 25 Cal.4th 543, 600 [106 Cal.Rptr.2d 575, 22 P.3d 347]; *People v. Ghent* (1987) 43 Cal.3d 739, 776–777 [239 Cal.Rptr. 82, 739 P.2d 1250].)

▆ Defendant claims the use of the phrase "whether or not" to preface certain factors (e.g., § 190.3, factor (e), "[w]hether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act") improperly prompts the jury to consider the absence of such factors as aggravating circumstances. Again, we have repudiated this claim on multiple occasions. (E.g., *People v. Tafoya* (2007) 42 Cal.4th 147, 198 [64 Cal.Rptr.3d 163, 164 P.3d 590]; *People v. Gray* (2005) 37 Cal.4th 168, 236 [33 Cal.Rptr.3d 451, 118 P.3d 496]; *People v. Kraft* (2000) 23 Cal.4th 978, 1078–1079 [99 Cal.Rptr.2d 1, 5 P.3d 68].) Defendant refers to a law review article reporting a study finding that jurors believe the absence of mitigating evidence may support a sentence of death. We have explained, however, that "[t]he mere absence of a mitigating element may weigh against a finding that the instant offense is less serious than 'normal,' and thus especially deserving of mercy, but it does not suggest that the crime is *more* serious than 'normal,' and thus especially deserving of death." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 788 [230 Cal.Rptr. 667, 726 P.2d 113].) Thus, "the sentencing jury is entitled to know that a defendant's crime *lacks* certain elements the state deems relevant to *leniency* in the choice of penalty." (*Id.* at p. 789; see also *People v. Ayala, supra*, 23 Cal.4th at p. 232; *People v. Ghent, supra*, 43 Cal.3d at p. 771.)

S. *CALJIC No. 8.88*

Defendant contends CALJIC No. 8.88, the trial court's concluding instruction to the jury, is constitutionally flawed in a number of respects, each of which we have addressed in earlier cases, finding no error.[24] The instruction told the jury that it "must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without the possibility of parole." Contrary to defendant's arguments, the "so substantial" language is not impermissibly vague and ambiguous (*People v. Tafoya, supra*, 42 Cal.4th at p. 189; *People v. Coffman and Marlow, supra*, 34 Cal.4th 1, 124; *People v. Breaux* (1991) 1 Cal.4th 281, 315–316 [3 Cal.Rptr.2d 81, 821 P.2d 585]), nor is the use of the term "warranted" instead of "appropriate" (*People v. Carey, supra*, 41 Cal.4th at p. 137; *People v. Perry, supra*, 38 Cal.4th at p. 320; *People v. Smith* (2005)

---

[23] Defendant cites only the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

[24] Defendant relies on the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

35 Cal.4th 334, 370 [25 Cal.Rptr.3d 554, 107 P.3d 229]). Neither is the instruction defective for failing to inform the jury that neither party bore the burden of persuasion on the penalty determination. (*People v. Geier, supra,* 41 Cal.4th at p. 619; *Coffman and Marlow,* at p. 124; *People v. Hayes* (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376].)

### T. *Imposition of Capital Punishment for Felony Murder*

Defendant claims that condemning him to death for a felony murder that did not require an intent to kill, while sparing some intentional killers from capital punishment, violates the Eighth and Fourteenth Amendments to the federal Constitution. We have rejected such claims. (*People v. Kennedy* (2005) 36 Cal.4th 595, 640 [31 Cal.Rptr.3d 160, 115 P.3d 472]; *People v. Taylor* (1990) 52 Cal.3d 719, 747–748 [276 Cal.Rptr. 391, 801 P.2d 1142]; *People v. Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306].) Defendant does not persuade us to change our view.

### U. *Miscellaneous Constitutional Challenges to the Death Penalty Statute*

Defendant presents a number of further constitutional attacks on the death penalty statute that we have rejected.[25] We continue to do so. Thus:

The "circumstances of the crime" factor provided by section 190.3, factor (a) does not foster arbitrary and capricious penalty determinations. (*People v. Barnwell, supra,* 41 Cal.4th at p. 1058; *People v. Cook, supra,* 40 Cal.4th at p. 1367.)

Section 190.3 sufficiently narrows the class of murderers eligible for capital punishment. (*People v. Barnwell, supra,* 41 Cal.4th at p. 1058; *People v. Bonilla* (2007) 41 Cal.4th 313, 358 [60 Cal.Rptr.3d 209, 160 P.3d 84].)

The burden of proof beyond a reasonable doubt does not apply to findings on the capital sentencing factors (except for other crimes), nor does the preponderance of the evidence standard. The jury's findings need be neither written nor unanimous. (*People v. Barnwell, supra,* 41 Cal.4th at p. 1059; *People v. Abilez* (2007) 41 Cal.4th 472, 533 [61 Cal.Rptr.3d 526, 161 P.3d 58].)

Review for intercase proportionality is not constitutionally required. (*People v. Barnwell, supra,* 41 Cal.4th at p. 1059; *People v. Geier, supra,* 41

---

[25] Defendant again refers to the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

Cal.4th at p. 618.) Defendant fails to support his assertion that this court has categorically forbidden such review; in the only case to which he refers, we considered the showing of alleged disproportionality and found it insufficient. (*People v. Marshall* (1990) 50 Cal.3d 907, 947 [269 Cal.Rptr. 269, 790 P.2d 676].)

Section 190.3, factor (b) does not violate the federal Constitution by permitting the use of unadjudicated criminal activity as an aggravating factor, nor must such factors be found true beyond a reasonable doubt by a unanimous jury. (*People v. Barnwell, supra*, 41 Cal.4th at p. 1059; *People v. Bonilla, supra*, 41 Cal.4th at p. 359.)

The use of the adjectives "extreme" and "substantial" in section 190.3, factors (d) and (g) is not unconstitutional. (*People v. Barnwell, supra*, 41 Cal.4th at p. 1059; *People v. Cook, supra*, 40 Cal.4th at p. 1366.)

"A penalty phase jury need not be instructed that section 190.3, factors (d), (e), (f), (g), (h), and (j) can only mitigate, and not aggravate, the crime. [Citation.]" (*People v. Barnwell, supra*, 41 Cal.4th at p. 1059; see also *People v. Bonilla, supra*, 41 Cal.4th at p. 360.)

"The death penalty law does not deny capital defendants equal protection because it provides a different method of determining the sentence than is used in noncapital cases. [Citation.]" (*People v. Barnwell, supra*, 41 Cal.4th at p. 1059; see also *People v. Bonilla, supra*, 41 Cal.4th at p. 360.)

## V. *Cumulative Error*

Defendant contends the cumulative effect of the errors at his trial requires reversal of his death sentence. We have found no prejudicial error at either phase of trial. The defects we have identified, i.e., the omissions from the appellate record, the faulty instruction on the felony-murder special circumstance, and the failure to properly reinstruct the jury at the penalty phase, do not, considered together, warrant reversal.

## W. *International Law*

Capital punishment in California is not a violation of international law, nor do the international norms asserted by defendant render the death penalty unconstitutional under the Eighth or Fourteenth Amendment. (*People v. Barnwell, supra*, 41 Cal.4th at p. 1059; *People v. Bonilla, supra*, 41 Cal.4th at p. 360.)

## III. DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied July 30, 2008. George C. J., did not participate therein.