Filed 9/9/13  P. v. Morales CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046611 |
| v. | (Super. Ct. No. 04SF0228) |
| DANIEL MORALES, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Frank F. Fasel, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Susan Miller, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury found defendant Daniel Morales guilty of burglary as charged in count one of the information, attempted forcible rape as charged in count two, attempted sodomy by force as charged in count three, and three counts of forcible lewd act upon a child under 14 as charged in counts four, five, and six. The jury found it to be true that counts four, five and six were committed during the commission of a first degree residential burglary in which the intent at the time was rape, that defendant used a dangerous or deadly weapon in the commission of the offenses, and that defendant engaged in the tying and/or binding of the victims while committing the offenses. The court sentenced defendant to a total of 50 years to life plus five years in prison.

On appeal, defendant contends the trial court erred when it limited his questions of a victim regarding past sexual assaults against her and in instructing the jury about the tying or binding allegation. Finding no error, we affirm.

I

FACTS

*The Incident*

When Virginia testified in late 2011, she was 29 years old. In March 2004, Virginia and her half sister, P., who was then 12 years old, were staying in a guest house of her employers, who were not home at the time. P. was visiting in order to help Virginia paint the bathroom of the guest house.

At about 2:00 o'clock in the morning, there was a knock on the door. Someone was calling Virginia by name. She was not expecting anyone, but she recognized defendant's voice and went to the door. Defendant was the husband of Maria, another sister of Virginia and P. Virginia described what defendant said when she opened the door: "He said he needed my help because my sister was really sick and she was in the car, and he wanted to take her to the hospital."

As she turned around, defendant entered the room and told Virginia he wanted to sleep with her. Virginia smelled alcohol and she ran toward her cell phone and

2

defendant grabbed it and threw it under the couch.  He then pushed Virginia onto the bed and went into the bathroom.

Virginia ran "to grab the house phone, and that is when he came back from the bathroom with a knife, and he pulled the cords from the wall."  She described what happened next:  "Then he pushed me into the bed and he [held] me down on my back.  Then I tried to push him away and get up.  That is when my sister woke up."  Defendant told P. to go back to sleep, put a pillow over P.'s face, kissed Virginia on her mouth and chest and pulled her pants and underwear down.

Defendant attempted to put his penis inside Virginia but was unable because she crossed her legs.  His penis came in contact with Virginia's vaginal area several times.  All the while, Virginia could see the knife.  She "kept telling him not to do it, to stop, and if he would go away, [she] wouldn't say anything."

Defendant turned Virginia so that she was face down.  He put the knife at her neck and tried to insert his penis into her anus.  His penis never penetrated her anus.  Virginia told him to look at photos she had of defendant's daughters.  Defendant tore pillowcases and sheets and tied a piece around her mouth.  She described:  "And then he tied a knot in one and put it inside my mouth, and then tied it at the back of my head, and then he tied my hands and he put me on the floor and had me sit on the floor."  Defendant waved the knife in front of Virginia's face and said, "She's next," and went over to P.

P. was 19 when she testified in 2011.  P. remembered Virginia telling defendant to leave.  P said:  "I got scared."  Regarding Virginia, P. added:  "Somehow she was laying down next to me and he was on top of her, and that is the next thing that I remember, that somehow she was laying like right next to me on the bed."

P. testified she wanted to protect Virginia, but she didn't know what to do.  The prosecutor asked her why she wanted to protect her sister, and P. responded:  "Because I was scared that he would hurt her and that he would hurt me after."

3

The next thing P. could remember was that defendant was on top of her. He held a knife. He took off her underwear and told her "not to make him mad because he was drugged." She said "he put his penis on my vagina and he kissed me around my neck and my chest." He put her on her stomach and his penis was pushing "against my butt." He tied her up.

P. said she "started thinking of what to tell him so he would stop." P. told defendant their father was going to pick her up at 4:00 a.m. Defendant asked Virginia whether or not that was true, and Virginia lied and told him it was true. Defendant got dressed and left. After he was gone, Virginia managed to untie herself and then she untied P.

After defendant left, Virginia untied P. and the two "started crying and talking about what [they] should do." They decided not to call the police or mention what happened to anyone. Virginia was asked why they decided that, and she responded: "Because I had had previous assaults, and whenever I tried to say anything no one believed me." The two decided to move to the main house. It was 4:00 a.m.

Virginia received a telephone call on her cell phone. It was defendant's home phone number. She did not answer it. When she saw there was a message left on her cell phone, she listened to it and realized it was her sister, Maria, who had called and she returned the call.

She told Maria what happened. Maria asked Virginia whether she had called the police, and said that "if I wouldn't call the police, she would." After Virginia ended the call with Maria, Virginia called the police. Defendant's DNA was found on Virginia's neck and face, as well as P.'s rectum and chest.

Maria testified she was sleeping the morning of March 5 when she heard the bedroom closet doors "and a noise like they were trying to force the door of the room open." She saw defendant's back when he was in the bedroom. She next saw defendant when he "took off running from the house." When she got up, she noticed his clothes

4

were gone from the closet. She also spotted a knife on the kitchen counter, which she gave to the police. The knife had not been on the counter when she went to bed the night before.

The police left equipment with Maria for her to record any telephone calls she might receive from defendant. When defendant telephoned her, Maria recorded the conversations and gave the recordings to the police. Defendant was located in Mexico and police took custody of him from Mexican authorities.

II

DISCUSSION

*Prior Sexual Attacks of Virginia*

Defendant contends the trial court denied him his "constitutional right to confront witnesses and present a defense by limiting questioning of alleged victim Virginia about her claim that she was sexually assaulted in the past and not believed when she reported the assaults."

Prior to jury selection, the prosecutor moved to exclude evidence of Virginia's reference to prior instances of sexual abuse. Defense counsel told the court: "I do plan on questioning Virginia . . . with regards to what we believe may in fact be false allegations of prior sexual assaults. She indicated that from the age of 4 to 15 she tells . . . ." "I was raped by my stepfather, my cousins, and unknown men from the age of 4 to 15, and I actually reported this to the police and nobody believed me. [¶] Well, we never received any reports that she actually made reports to the police at any time from the age of 4 to 15." "I think these are false accusations. I don't think they fall under Evidence Code 782."

The court asked defense counsel why the information about prior assaults of Virginia were probative, and defense counsel responded: "The defendant has told the detectives all along that he was having an affair with her, and she is denying that. Setting that aside from what took place with [P.], you are dealing with a situation where you may

5

have a consensual relationship and they get caught and it goes wrong and he does something else. [¶] She is in a position where she has let this happen. She let him in. He puts himself on the little girl. It would never happen to the little girl if they were not having the affair and she did not let him in there. Now we are not calling the police. No one will believe us."

In denying the defense request to go into prior incidents of sexual attacks against Virginia that she mentioned to the police, the court noted there was "no offer of proof by the defense that there were false statements." The court then stated that "if the defense goes into time, date, persons, reports, that that would involve an undue consumption of time and as an indicated that would rise to the People's [Evidence Code section] 352 objection." The court added: "I want the record to be clear, however, that the court is not eliminating the defense's ability to cross-examine this witness in this area. Because it sort of depends on [the prosecutor's] direct and more importantly how far [defense counsel] wants to go with cross-examination."

During cross-examination of Virginia, the following questions and answers were asked by defense counsel and answered by Virginia:

"Q: It's at this point that you tell [Officer Caballero] that you were molested when you were four?"

There was an objection based on Evidence Code section 352, and the court held a hearing outside the presence of the jury. The court summed up the sidebar by stating: "Let's do it this way. I will sustain the objection without prejudice. If you want to rephrase because the age thing is not really probative. Separate and apart from that, you know, let's try it question by question."

"Q: And the two of you [Virginia and P.] talk about what just happened?
"A: We didn't talk about what had happened.
"Q: You told her that there was no point in telling anybody this?
"A: Yes

6

"Q: And you told her there was no point because no one is going to believe you guys?

"A: Yes.

[¶] . . . [¶]

"Q: You told [P.] no one is going to believe you because you had been molested in the past, right?

"A: Yes.

"Q: And this had happened multiple times?

"A: Yes."

An objection based on relevance was sustained and the last answer was stricken by the court.

"Q: Did you tell investigator Caballero that you told [P.] you weren't going to tell anybody because you had been molested?

"A: Yes.

"Q: But you never told investigator Caballero who molested you?"

An objection based on relevance was sustained.

Defense counsel then re-asked the same question, asked whether the witness told Caballero when and how many times there were other molestations. The court sustained objections based upon relevance and Evidence Code section 352. Defense counsel then moved on to another area of questioning.

Evidence Code section 782 permits the evidence of sexual conduct of a complaining witness if a specific procedure is followed. Both during trial and in his appellate brief, defendant disclaims any interest in arguing the present situation falls into the category covered by this statute.

"Evidence Code section 352 accords the trial court broad discretion to exclude even relevant evidence 'if its probative value is substantially outweighed by the probability that its admission will . . . create a substantial danger of undue prejudice,

7

confusing the issues, or misleading the jury.'" (*People v. Clark* (2011) 52 Cal.4th 856, 893.) Not every restriction on a defendant's desired method of cross-examination is a constitutional violation. The trial court retains wide latitude in restricting cross-examination that is prejudicial, confusing of the issues or of marginal relevance. (*People v. Harris* (2008) 43 Cal.4th 1269, 1292.) "Moreover, reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination." (*People v. Brown* (2003) 31 Cal.4th 518, 545.)

Here the court specifically inquired about an offer of proof that something Virginia said about prior assaults was false. Such an offer of proof was not forthcoming. Nonetheless, defense counsel was permitted to elicit from Virginia the facts that she and P. talked about not reporting the incident to the police, and that the reason she did not want to make a report was that she had been molested in the past.

Defense counsel was also permitted to inquire of Virginia about the supposed affair she and defendant were having, which is what defense counsel informed the court was the relevance of the information about prior sexual assaults. The following questions were asked during cross-examination and answered by Virginia.

"Q: Between 1993 and 2004 up to this event there were times you and [defendant] had been alone together at his house?

"A: Yes.

"Q: Alone at your house?

"A: Not at my house, no.

[¶] . . . [¶]

"Q: And occasionally about three months prior, talking around December 2003 and January 2004, [defendant] started making advances toward you. . . .

[¶] . . . [¶]

"A: I don't remember.

8

"Q: You don't remember?

"A: No.

"Q: You don't remember in January of 2004 [defendant] kissing you?

"A: He never kissed me.

"Q: From January up to March, actually back in December, [defendant] would hold your hand when his wife wasn't looking?

"A: No.

"Q: And sometimes he would kiss you when his wife wasn't looking?

"A: No.

"Q: And sometimes he would do it while his wife was in the other room?

"A: No.

[¶] . . .[¶]

"Q: And it progressed and kept going on and on during [these] three months, and [defendant] would give you rides back and forth to the address where you worked at, correct?

[¶] . . .[¶]

"A: Yes, he will give me rides.

"Q: And during those time periods that he gave you rides sometimes you rode alone together?

"A. What?

"Q: Sometimes you rode alone together?

"A: Yes.

"Q: And while you guys were alone together he told you of his affections for you?

"A: No.

"Q: And the two of you would kiss together in the car?

"A: No."

9

The cross-examination of Virginia continued without interruption. She denied she invited him to the guest house and she denied the two had sex on the couch. She also denied telling defendant, "I'm on my period, I'm not going to get pregnant."

Under the circumstances we find in this record, not only do we find defendant's constitutional rights were not violated, we also find he was given ample opportunity to cross-examine Virginia about her credibility. We conclude the trial court did not err.

*Tying or Binding*

Defendant next argues the trial court erred in instructing the jury on the tying or binding allegation as charged in counts four, five and six. He states: "The evidence does not establish that the tying of the victims was part of the lewd conduct involving [P.], the victim of the counts to which that enhancement was alleged. The other victim, Virginia, was tied after the attempted sex assault was completed. [P.] did not remember how she was tied up, except that [defendant] did it and it happened at the end. After [defendant] left, Virginia noticed that [P.] was tied up." The essence of defendant's argument is that the tying or binding must be done in the commission of the lewd act, not afterward, and the evidence here does not support a conclusion P. was tied or bound during the commission of the lewd acts.

"(a) A person who is convicted of an offense specified in subdivision (c) . . . shall be punished by imprisonment in the state prison for life and shall not be eligible for release on parole for 25 years except as provided in subdivision (j). [¶] (c) This section shall apply to any of the following offenses: [¶] (4) A violation of subdivision (b) of Section 288. [¶] . . . [¶] (e) The following circumstances shall apply to the offenses specified in subdivision (c): . . . (6) The defendant engaged in the tying or binding of the victim or another person in the commission of the present offense." (Former Pen. Code, § 667.61, subds. (c)(4) and (e)(6), added by Stats. 1998, ch. 936, § 9.)

10

The jury instruction requested by the prosecution and given by the court states: "The People must prove that the defendant tied or bound Virginia . . . or [P.] in the commission Forcible Lewd Act Upon a Child Under 14, as charged in Counts 4-6. [¶] [The crime of Forcible Lewd Act Upon a Child Under 14 continues until the perpetrator has actually reached a temporary place of safety. The perpetrator has reached a temporary place of safety if he has successfully escaped from the scene[,] [and] is no longer being chased [,and is no longer in continuous physical control of the person who was the target of the crime].]"

The following questions and answers occurred between the prosecutor and P.:

"Q: Were you tied up at some point that night?

"A: Yes. I just don't remember exactly how it got to that point.

"Q: Do you remember who tied you up?

"A: He did.

"Q: Do you remember when during the course of events it was that he tied you up?"

An asked and answered objection was overruled.

"A: At the end."

At the conclusion of the prosecution's case, defense counsel made a motion under Penal Code section 1118.1 "to the specific allegation with regards to the tying and binding, that it wasn't done during the commission of the offense." The trial court denied the motion.

In *People v. Jones* (2001) 25 Cal.4th 98, a woman was raped and sodomized over a period of approximately an hour and a half at which point the defendant pulled up his pants and retrieved a knife. He put the knife to the victim's face, and left shortly thereafter. (*Id.* at pp. 101-102.) In *Jones*, the California Supreme Court analyzed the meaning of the words "in the commission of" in Penal Code section 12022.3

11

as well as in Penal Code section 667.61, subdivision (e)(4).  The court stated it "must answer a question of law concerning the meaning of the phrase 'in the commission of' as it appears in both statutes.  Specifically, can the use of a weapon *after* a series of sex crimes properly be found to have occurred 'in the commission of' the crimes?"  (*Id.* at pp. 107-108.)

In *Jones*, the defendant contended that because he had completed the elements of the sex offenses before using the knife, the weapons-use enhancement was unrelated to those crimes.  (*People v. Jones*, *supra*, 25 Cal.4th 98, at p. 110.)  The court concluded that a broad construction of the phrase "in the commission of" advances the purpose of enhancements which provide for additional punishment when a weapon is used.  (*Id.* at p. 111.)

*Jones* is helpful in our present analysis.  Just as a broad construction of the phrase "in the commission of" advances the purpose of the statutes involved in that case, it advances the purpose of Penal Code section 288, subdivision (b)(1) as well.  The essence of that subdivision is "the use of force, violence, duress, menace, or fear."  By tying and binding a victim, whether or not the specific sexual contact has been completed, a victim's fear must be greatly increased.  After all, P. did not know that defendant was leaving.  For all she knew, he was simply taking a rest while he planned his next move.

Analogizing the present situation to *People v. Carroll* (1970) 1 Cal.3d 581, is also appropriate here.  In *Carroll*, the defendant pointed a gun at a man in the restroom of a bar.  The man, Gulsvig, slammed a door in the defendant's face and ran into the bar to hide.  The defendant came behind the bar to the cash register and noticed the man on the floor.  The man threw a case of empty beer bottles at the defendant, just as the defendant shot the man, inflicting a serious abdominal injury.  The defendant then removed money from the cash register and left the bar.  (*Id.* at p. 583.)  The court found the fact that the defendant was not engaged in the asportation of any loot at the time he

12

shot the man to be immaterial, stating: "He became angry after discovering no money in the wallet and having the rest room door slammed in his face. His purpose in running into the bar appears to have been to exact revenge from Gulsvig. Under the circumstances, the robbery and shooting of Gulsvig constituted one indivisible transaction, with the shooting flowing directly from the taking of the wallet. (*Id.* at pp. 584-585.) The facts in the present case similarly comprise one indivisible transaction. The victims were both tied as part of defendant's attack.

Additionally, we note that Penal Code section 667.61, subdivision (e)(6) also applies when a defendant engages in the tying or binding of another person as well as the victim. Here, all the while defendant was attacking P., he had Virginia tied and bound.

We further note that the act of tying and binding in this case may have been part and parcel of defendant's sexual crimes. He tied or bound both of his victims at least by the end of the sexual acts themselves. All of defendant's actions, including his forcing his way into the house, pressing himself on top of the victims, threatening his victims with a knife, various acts with his penis and then tying or binding them, involved power and control over the victims. A jury could reasonably conclude that defendant's act of tying or binding his victims may have been the completing act of his method of sexual attack.

Under these circumstances, we conclude that even if the sexual acts against P. were completed at the time he tied or bound her, Penal Code section 667.61, subdivision (e)(6) still applies. The trial court's instructions were proper here in that the tying or binding occurred during the commission of the lewd and lascivious acts upon P.

13

## III

## DISPOSITION

The judgment is affirmed.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.

14